**CADBURY BEVERAGES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondents.**

No. 98–1054.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 20, 1998.

Decided Nov. 17, 1998.

Richard N. Chapman argued the cause and filed the briefs for petitioner.

David Habenstreit, Supervisory Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, and Deborah E. Shrager, Attorney.

Before: SILBERMAN, WILLIAMS, and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Petitioner Cadbury Beverages, Inc. seeks review of the NLRB's decision and accompanying order that Cadbury violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act when it suspended and terminated Eugene Matzan. The Board filed a cross-application for enforcement of its order. Since—although it is close—we find substantial evidence supporting the Board's determination, we deny the petition for review and grant the crossapplication for enforcement.

## I.

Eugene Matzan is an electrician in Cadbury's food processing plant in Williamson, New York. In the early months of 1995, Matzan, who had become discontented with the performance of the incumbent union (Retail, Wholesale and Department Store Union, Local 220, AFL–CIO) and its fiscal management, made several requests to union officials to review the union's financial records and its by-laws. After distributing copies of one such document to fellow employees, union officials called a meeting (which James Fischette, Matzan's supervisor, ordered Matzan to attend) at which union officials put pressure on Matzan to cease his anti-incumbent activities. After Matzan circulated a petition calling for a meeting to consider changes to the union's by-laws and to review an audit, Fischette informed Matzan that union business was not permitted on company time (despite Matzan's insistence that his union activity occurred during breaks).

Matzan's suspension arose out of a conversation in mid-March 1995 between Matzan and his co-worker Lisa Dennis, who had recently returned from maternity leave. According to Matzan, Dennis told Matzan that she had not received an expected bonus and was planning to ask Larry Graffius, the union's then-vice president, for assistance. Matzan then advised Dennis against informing Graffius because two months earlier Matzan had overheard Graffius tell Jane DeGroote, Cadbury's human resources coordi-

nator, that the company should have fired Dennis (whom Graffius identified with an unflattering expletive) when it had the chance to do so. At a meeting later in March, union president Blackmon told Meador, Cadbury's human resources manager, that Matzan had been spreading a false rumor that Blackmon, Graffius, and Meador wanted to fire Dennis because she had taken maternity leave. Meador decided to investigate the matter immediately and called Dennis, Matzan, and DeGroote into the meeting for questioning. Recollections differ as to who said what at the meeting about the story that Matzan told Dennis. The crux of the dispute is whether Graffius said anything at all to DeGroote about firing Dennis, and whether Matzan's story implicated Meador or DeGroote, along with Graffius, in making the negative comments about Dennis. Meador ultimately concluded, based primarily on DeGroote's shocked reaction when confronted with Matzan's story, that Matzan's story was most likely false and that the potential damage to DeGroote, Meador, and the human resources department was sufficiently serious to warrant suspension without prior warning. After Matzan walked out of a meeting on April 10 to discuss the situation before the company imposed discipline, Matzan was suspended for three days.[1]

Matzan's termination arose out of his attempt to attend an arbitration hearing of a co-worker, Bill Gowan, on Monday, September 11, 1995. Although Matzan had conducted an unofficial investigation of Gowan's case at the request of a union steward, Matzan had no official role to play at Gowan's arbitration hearing and planned to attend solely because he had given Gowan his word that he would try to do so (Gowan, according to Matzan, did not trust the union representative.). On September 6 or 7, Matzan asked Fischette if he could work an earlier shift on Monday, September 11, explaining that he needed the schedule change for "personal" reasons. Fischette told Matzan that the schedule change would probably not be a problem and that he would see what he could

---

1. Matzan was suspended again later in April in an unrelated incident that did not form part of the general counsel's charges against the company.

At that time Matzan was given a warning that further disciplinary problems could lead to his termination.

do. On Friday, after Fischette learned that Monday was the beginning of the "fall pack season," the busiest day of the year for the whole plant, Fischette told Matzan that he could not work the earlier shift. When Matzan insisted that he needed the time for personal business, Fischette told Matzan to see if he could reschedule his business and that if he could not, to tell Fischette how much time he needed.

On Saturday, Fischette again told Matzan that he could not switch his schedule. But when Matzan informed Fischette that his still unidentified "personal business" would only take a couple of hours and that he could probably take care of it on his lunch hour, Fischette again indicated some flexibility, telling Matzan that they would have to wait until Monday to decide. Later that Saturday, however, Fischette learned from Tony Peluso, another electrician, that Matzan wanted the time to attend Gowan's arbitration. On Monday morning, after Matzan reiterated that he needed the time for "personal business," Fischette asked Matzan directly whether he was planning to attend Gowan's arbitration. Matzan indicated that he could go where he liked on his lunch hour, and Fischette then instructed Matzan not to attend the arbitration and that he would be subject to discipline if he did. Later that morning, each tried to page the other to no avail: Fischette needed Matzan to fix a malfunctioning conveyor, and Matzan wanted to tell Fischette that he was taking an early lunch and that Peluso would cover for him (even though company policy permitted such lunch substitutions without supervisory approval). A security guard, pursuant to Fischette's instruction, informed Matzan on his way out that he was needed on the floor, but Matzan told the guard that he was going to lunch and proceeded to the conference room for the arbitration. After Cadbury's attorney insisted that Matzan leave Gowan's arbitration, Matzan returned to work, whereupon Fischette, following Meador's instructions, immediately suspended Matzan. Meador and Fischette deliberated further and Cadbury terminated Matzan by letter on September 15.

The general counsel filed charges alleging that the company violated section 8(a)(1) of the NLRA when it suspended Matzan, and that it violated sections 8(a)(1) and 8(a)(3) when it terminated him. On the suspension charge, the ALJ found that Matzan's discussion with Dennis was protected activity, that the company knew it was protected, that Matzan was suspended for misconduct in the course of that protected activity (defaming Cadbury's human resource department), and that Matzan was not in fact guilty of the misconduct (since Matzan only implicated union member Graffius in the story he told Dennis). The ALJ also considered the company's motive in suspending Matzan and concluded that the real reason for the suspension was Matzan's protected activity. Turning to the unlawful termination charge, the ALJ concluded that the general counsel satisfied its burden of proving that anti-union sentiment was a substantial factor in Matzan's termination, and that the company did not carry its burden to prove that Matzan's alleged insubordination would have resulted in his termination even in the absence of his protected activity. The ALJ ordered Cadbury, among other things, to rescind Matzan's suspensions and to reinstate him to his former position with back pay.

The Board, with one member dissenting, affirmed all of the ALJ's findings and conclusions and adopted the ALJ's recommended order. The Board ratified the ALJ's decision on the suspension charge in a footnote without discussion, pausing only to note that the dissenting board member agreed with the ALJ on this issue. The Board elaborated its reasons for adopting the ALJ's conclusions on the termination charge, highlighting Fischette's denial of Matzan's request outright only after he learned the purpose of Matzan's request, and noting that "[s]uch an abrupt reversal of position clearly evidences Respondent's animus toward Matzan's protected activities and its retaliatory intent." The Board found that Cadbury did not terminate Matzan for insubordination since Matzan fully complied with company policy when he attended the arbitration. Board member Higgins dissented on grounds that Fischette consistently denied Matzan's request and that Matzan was insubordinate.

Petitioner claims that the Board's finding of a section 8(a)(1) violation for the company's suspension of Matzan was not supported by substantial evidence. Petitioner also asserts that the Board ignored its own precedent governing employees' right to attend arbitration hearings when it concluded that petitioner's termination of Matzan violated sections 8(a)(1) and 8(a)(3). In what appears to be an argument in the alternative on this second point, petitioner claims that substantial evidence does not support the Board's determination that the company's termination of Matzan was motivated by anti-union animus.

## II.

■ Petitioner argues that the suspension could not constitute a section 8(a)(1) violation "as a matter of law" because Matzan's conversation with Dennis was not protected, concerted activity. In support of this argument, the company relies on Board precedent establishing the well-settled proposition that mere talk between co-workers is not concerted activity protected by the NLRA. *See, e.g., Daly Park Nursing Home,* 287 N.L.R.B. 710, 1987 WL 90111 (1987). What petitioner overlooks, however, is that the ALJ's opinion, adopted by the Board, specifically distinguished the *Daly Park* line of cases from those Board cases establishing the rule that discussion among employees about subjects affecting their employment is, when directed toward future action, protected, concerted activity. *See, e.g., Express Messenger Sys.,* 301 N.L.R.B. 651, 1991 WL 29865 (1991); *Jhirmack Enter.,* 283 N.L.R.B. 609, 1987 WL 89576 (1987).

■ Matzan's conversation with Dennis about not turning to Graffius for assistance in obtaining a bonus clearly falls within this latter line of cases. Nor are we impressed with petitioner's argument that substantial evidence does not support the Board's finding that Dennis and Matzan were talking about Dennis' bonus. Although Dennis could not remember the context of the conversation, she did not contradict Matzan's account. This is an issue of credibility on which the ALJ was entitled to credit Matzan's testimony (petitioner's assertion that Matzan's testimony was self-contradictory is the product of selective transcript snipping and borders on the frivolous). Petitioner should be aware that we do not reverse the Board's adoption of an ALJ's credibility determinations unless, unlike here, those determinations are "hopelessly incredible," "self-contradictory," or "patently unsupportable." *Capital Cleaning Contractors, Inc. v. NLRB,* 147 F.3d 999, 1004 (D.C.Cir.1998); *Elastic Stop Nut Div. of Harvard Indus., Inc. v. NLRB,* 921 F.2d 1275, 1281 (D.C.Cir.1990).

■ Petitioner alternatively asserts that the conversation was not protected activity because Matzan's reckless disregard of whether the story he told Dennis was true or false rendered his remarks so defamatory as to lose the protection of the Act. *See HCA Health Servs. of New Hampshire, Inc.,* 316 N.L.R.B. 919, 1995 WL 139739 (1995). Petitioner claims that Matzan "seriously impugned" the reputation of the human resources department by implicating Meador or DeGroote in making negative remarks about Dennis. But the ALJ was entitled to credit the testimony, including testimony from Dennis, indicating that Matzan accused Graffius alone.

■ We think very little of petitioner's contention that an employee is under some obligation to verify the truth of what the employee himself overhears, when the sole reason for the employee's allegedly defamatory statement is to communicate the fact that the conversation he overheard occurred. Unlike the situation in which an employee repeats a rumor told to him by another without verifying the facts underlying the rumor, *see HCA Health Servs.,* there was nothing for Matzan to verify when he told Dennis what he heard Graffius say to DeGroote. Any duty to avoid reckless rumor-mongering does not impose an obligation to verify the competence of one's auditory faculties. In any event, the ALJ credited Matzan's testimony that the conversation between Graffius and DeGroote in fact occurred, based in part on an adverse inference from Graffius' failure

to testify,[2] and in part on the ALJ's discounting of DeGroote's impassioned denial given the various competing reasons that may have motivated her (such as protecting herself from possible discipline). In sum, there is easily substantial evidence supporting the ALJ's and the Board's finding that Matzan's protected conversation occurred and that it did not become unprotected because of the manner in which it was communicated.

■ The Board's decision on the suspension claim is thus readily resolved. In cases involving employee discipline for alleged misconduct in the course of a protected activity that the employer knew was protected, an employer violates section 8(a)(1) if it is proven that the alleged misconduct did not occur, whether or not the employer acted in good faith. *See NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 23, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964). This case, as the ALJ understood, fits squarely in the *Burnup & Sims* framework: Matzan's actions were protected, the company knew that they were protected,[3] and Matzan was suspended for defamation in the course of protected activity that, according to the substantial evidence relied upon by the ALJ, simply did not occur. Although the ALJ went on to discuss Cadbury's motive for suspending Matzan, we agree with the Board's counsel on appeal that *Burnup &*

*Sims* explicitly obviates the need to inquire into intent and ends the analysis.[4]

### III.

■ Petitioner's argument against the Board's termination decision is really only another substantial evidence challenge subject also to limited and "highly deferential" review. *Allentown Mack Sales & Serv., Inc. v. NLRB*, —— U.S. ——, ——, 118 S.Ct. 818, 823, 139 L.Ed.2d 797 (1998) (substantial evidence inquiry is "whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion"); *Capital Cleaning Contractors*, 147 F.3d at 1004. Petitioner attempts to dress this pedestrian challenge in the slightly more rarefied doctrinal clothes of the Board's obligation to adhere to its own precedents. But as we explain, petitioner's argument, stripped down, is nothing more than a bare, and ultimately futile, substantial evidence challenge.

The precedent in question is *Ohmite Mfg. Co.*, 290 N.L.R.B. 1036, 1037–39 (1988), which holds that, in order for an employer's refusal to allow an employee to attend a Board hearing to constitute an unfair labor practice, the general counsel must first make a *prima facie* case that the refusal was improperly motivated *or* that the employee had a "real need" to attend the hearing. The burden then shifts to the employer *either* to discredit

---

2. We note that it is somewhat unusual for the ALJ to treat a union vice-president as a witness "presumably friendly" to an employer's case. *See Gatliff Coal Co.*, 301 N.L.R.B. 793 n. 2, 1991 WL 40227 (1991), *enforced* 953 F.2d 247 (6th Cir. 1992). However, given the special circumstances of this case—involving an employee waging a campaign against an incumbent union that the record shows management favored and joined forces with against the employee—we think the ALJ was entitled to treat Graffius as a witness presumably friendly to the company's case, whose failure to testify permitted an adverse inference that Graffius made the comment that Matzan attributed to him. *See generally UAW v. NLRB*, 459 F.2d 1329 (D.C.Cir.1972).

3. It is true that petitioner's litigation arguments that the conversation was not protected could be taken to imply that the company did not *know* at the time that Matzan's conversation with Dennis was protected. However, because petitioner does not challenge the ALJ's determination that it knew of Matzan's protected activity, petitioner has waived that argument.

4. The ALJ thought, and the Board did not correct him, that the Board typically inquires as part of the *Burnup & Sims* inquiry whether the challenged action would have taken place even in the absence of the protected activity. But that analysis is generally appropriate in the sort of case in which the general counsel's charge is based on an unlawful motive—it gives the employer the opportunity to prove that, despite any unlawful motive, the same action would have occurred pursuant to some additional, lawful motive. *See Wright Line, Inc.* 251 N.L.R.B. 1083 (1980), *enforced* 662 F.2d 899 (1st Cir.1981). In any event, the ALJ actually conducted a different analysis, and asked whether Cadbury's asserted reason for Matzan's suspension—the misconduct—was pretextual. But since *Burnup & Sims* imposes liability for an employment action erroneously taken because of alleged misconduct, regardless of motive, *see Allied Indus. Workers v. NLRB*, 476 F.2d 868, 880 (D.C.Cir.1973), it is plainly irrelevant whether Cadbury's proffered reason for acting was pretextual.

the general counsel's evidence of improper motivation, or to show that it had an over-riding business reason for its refusal that outweighs the employee's need to attend the hearing. *See id.* Petitioner of course maintains that, because Matzan had no real need to attend Gowan's arbitration, the company's business interests tip the scale in its favor. But in concluding that that fact immunizes the company from liability, petitioner reads the disjunctive out of *Ohmite,* and seemingly asserts the baffling proposition that the Board must always engage in *Ohmite*'s balancing, irrespective of the motivation behind the employer's refusal. We need do no more than state *Ohmite*'s holding to show that petitioner's view is plainly not the law of the Board, nor the law of this circuit, *see Service Employees Int'l Union Local 250 v. NLRB,* 600 F.2d 930, 935–37 (D.C.Cir.1979). The Board did not ignore its own precedent; petitioner simply misunderstood it.[5]

■ Petitioner's real complaint, then, is that the Board's finding of discriminatory motive in Matzan's termination was not supported by substantial evidence and here it is on firmer ground. In order for an employer's discharge of an employee to constitute an unfair labor practice, the general counsel must first prove that the activity for which the employee was fired was protected, that the employer was aware of the protected activity, that the timing of the contested discharge is proximate to the protected activities, and ultimately that anti-union animus was a substantial or motivating factor in the termination. *See Wright Line, Inc.,* 251 N.L.R.B. 1083, 1980 WL 12312 (1980), *enforced* 662 F.2d 899 (1st Cir.1981), *approved by the Supreme Court in NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983); *MECO Corp. v. NLRB,* 986 F.2d 1434, 1437 (D.C.Cir.1993). Even if the general counsel sustains this burden, the employer can successfully defend by proving as an affirmative defense that the challenged termination would have occurred even in the absence of the protected conduct. *See Wright Line,* 251 N.L.R.B. at 1089; *NLRB v. Transportation Management Corp.,* 462 U.S. at 399–400, 103 S.Ct. 2469; *see generally Southwest Merchandising,* 53 F.3d at 1339–40.

Petitioner's case is considerably helped because both the ALJ and the Board included in their opinions factual findings that can in no way be thought supported by substantial evidence. For example, in explaining that Cadbury was aware of Matzan's protected union activities, both the Board and the ALJ seemed to suggest that Cadbury was aware of Matzan's participation in the investigation and preparation of Gowan's arbitration case. But as petitioner effectively points out, nothing in the record indicates that the company knew of Matzan's pre-arbitration assistance before September 15 (the day on which Matzan was fired). The ALJ, moreover, rejected as "almost pretextual" petitioner's asserted reason for discharging Matzan partly on the ground that there was no evidence in the record of major electrical problems when Fischette claimed to have needed Matzan on the line (between 9:00 and 10:00 a.m.). Yet, Fischette specifically testified that there was a broken conveyor on Line A around 9:25 a.m. and that the other electricians were busy. Last, the Board rejected Cadbury's claim that Matzan was insubordinate when he left the plant despite Fischette's explicit order forbidding it in part because of Cadbury's supposed policy that electricians were not required to respond to pages when they are en route to lunch. But Fischette explicitly denied that such a policy existed and pointed to special time cards that employees carry for the very purpose of enabling them to respond to pages while at lunch. The only evidence supporting Cadbury's supposed policy, besides Matzan's rather self-serving account, was testimony from the security guard

---

5. We note that in cases involving discriminatory motive in the denial of a request to attend a hearing, such as this one, the Board applies the motive test of *Wright Line,* which essentially takes the case out of *Ohmite* altogether. This is important because the *Wright Line* test has been subject to important clarifications by the Supreme Court (notably that the burden of persuasion always rests on the general counsel, *see Office of Workers' Compensation Programs v. Greenwich Collieries,* 512 U.S. 267, 114 S.Ct. 2251, 2258, 129 L.Ed.2d 221 (1994)), which are not evident from *Ohmite*'s use of the term *"prima facie"* case to describe the general counsel's initial burden. *See Southwest Merchandising Corp. v. NLRB,* 53 F.3d 1334, 1339–40 (D.C.Cir.1995).

that about 5% of employees do not respond to pages when they are on their way home (rather unconvincing proof of any company policy, let alone one governing pages at lunchtime).

■ Still, the Board focused its finding of anti-union animus directed at Matzan's protected activity[6] on Fischette's abrupt change in position after learning that Matzan wanted time off to attend Gowan's arbitration hearing—a factual finding which is supported by uncontroverted evidence and which we think is sufficient on its own to support the Board's finding of anti-union animus. *See United Steelworkers Local Union 14534 v. NLRB*, 983 F.2d 240, 244 (D.C.Cir.1993) (holding that factual findings may be reversed only when the record is so compelling that no reasonable fact-finder could fail to find the contrary). It is true that, as dissenting Board member Higgins and petitioner contend, Fischette consistently denied Matzan permission to take time off or to switch his shifts. But that truth is also plainly beside the point, since the ALJ and the Board majority focused on Fischette's change in position from a tentative denial on September 9, to an outright rejection on September 11, with the sole intervening fact Fischette's discovery of Matzan's plan to attend the hearing. And petitioner's theory that Fischette was intuitively performing *Ohmite*'s balancing test when he denied Matzan's request is, though artful advocacy, simply a highfalutin (and, we might add, rather unrealistic) way of saying that Fischette and the company had no unlawful motive—which is precisely what the ALJ and the Board rejected. The Board majority was entitled to hang its hat on Fischette's flip-flop. Although hardly overpowering evidence of animus, we cannot call it insubstantial, even though a finding of

no animus would have been easily justifiable on these facts, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and one that we might be inclined to make were we deciding the issue ourselves, *see Elastic Stop Nut*, 921 F.2d at 1279. As we have explained before, our review of the Board's motive determinations, including inferences of improper motive drawn from the evidence, is especially deferential. *See Capital Cleaning Contractors, Inc.*, 147 F.3d at 1004; *Laro Maintenance Corp. v. NLRB*, 56 F.3d 224, 229 (D.C.Cir.1995).

■ We also think the Board's conclusion at the second step of the *Wright Line* test is supported by substantial evidence. We emphasize that the question on review is not, as petitioner would have it, whether the Board's conclusion that Matzan fully complied with Cadbury's policies is supported by substantial evidence. If it were, this case would be even closer than it already is, for as we noted above, the Board's finding to that effect is, to be charitable, thinly supported. The Board's discussion of the insubordination issue, however, must be placed in its doctrinal context: it is a subsidiary aspect of petitioner's overall burden to prove, as an affirmative defense, that despite any anti-union animus, petitioner *would* have fired Matzan *because of* his insubordination, not that it *could* have done so. *See Wright Line*, 251 N.L.R.B. at 1089 (employer's burden is to "demonstrate that the same action *would have taken place* even in the absence of the protected conduct") (emphasis added); *Southwest Merchandising*, 53 F.3d at 1340 (company bears the burden of proving that nondiscriminatory motive was in fact the cause of the action). It was therefore not incumbent on the general counsel to

---

6. Petitioner argues that Matzan's attendance at Gowan's hearing was not protected activity because Matzan had no "real need" to attend and could not have survived *Ohmite*'s balancing test. But the suggestion that an employee who would fail the *Ohmite* balancing test is necessarily engaged in unprotected activity if he attends the hearing is a blatant case of mixing apples and oranges. That an employee's right to attend a hearing may be trumped by an employer's countervailing business reasons does not mean that attending a hearing of a co-worker is unprotected activity. If that were so, *Ohmite* balancing's

test would eviscerate *Ohmite*'s alternative consideration of whether the motivation for the denied request was discriminatory (which presupposes that attendance at a coworker's hearing, even without a "real need" to attend, is protected activity). Although we see no need to speculate as to the precise scope of this protected activity, we think the Board was correct that an employee's attendance at the arbitration hearing of a coworker, where the employee had helped in investigating the co-worker's grievance and the coworker requested the employee's presence, is protected activity.

prove, nor on the Board to find, that the company's asserted nondiscriminatory reason of insubordination was pretextual—that is, "wholly without merit"—although such a showing would have served as a conclusive rejection of Cadbury's affirmative defense. *Wright Line*, 251 N.L.R.B. at 1084 & n. 5; *Southwest Merchandising*, 53 F.3d at 1339 n. 7 (distinguishing "dual motive" and "pretext" cases). The question for us is whether substantial evidence supports the ALJ's finding, adopted by the Board, that Cadbury failed to prove an *actual,* lawful motivation for Matzan's termination.[7]

The ALJ explicitly found, given the illicit motive evident from the circumstances of Fischette's change in position, that Cadbury would not have fired Matzan were it not for its antiunion animus. *See Southwire Co. v. NLRB,* 820 F.2d 453, 463 (D.C.Cir.1987) (affirming Board's finding that employer failed its affirmative defense because of the evidence of illicit motive and because the ALJ concluded that the real reason for the discharge was the employee's union activities and not his admitted rule violation). All of petitioner's evidence designed to undermine this conclusion relates to its formal policy against unauthorized leaving, which completely ignores the uncontroverted evidence that electricians were permitted by company policy to switch their lunch breaks without authorization if they arranged for a replacement (which Matzan did). Petitioner's notion, adopted by dissenting Board member Higgins, that Fischette gave an advance refusal of Matzan's ordinary ability to switch his lunch would be persuasive were it not for the crucial finding that the advance refusal was tainted by an illicit motive. Petitioner cannot overcome its burden at *Wright Line* step two by pointing to an employee's unwillingness to comply with an order that the Board determined (and which we affirm) to be unlawful at *Wright Line* step one. And although the general counsel's proof of a

policy authorizing employees to ignore pages is less than compelling, petitioner, on whom the evidentiary burden lies, has not pointed to any policy authorizing termination for failure to respond to a page en route to lunch (the only plausible grounds for believing Matzan to be insubordinate), nor has it offered any evidence of similar treatment of those employees who have acted similarly. *See Capital Cleaning,* 147 F.3d at 1007 (upholding Board's finding of unlawful motive at *Wright Line* step two because the employer "failed utterly" to show that it would have taken the same action absent its unlawful motive).

To be sure, the Board did not state the issue in these terms; it remarked only on the question whether the company's asserted insubordination defense was pretextual (*i.e.,* that no insubordination in fact occurred). But, the Board adopted all of the ALJ's findings and conclusions, including the conclusion that Cadbury would not have terminated Matzan for insubordination (if any). *See Elastic Stop Nut,* 921 F.2d at 1281 (affirming Board's order based on Board's adoption of the ALJ's specific findings rejecting employer's *Wright Line* defense, even though Board itself provided no discussion of that issue). We will not upset that conclusion, and the ALJ's more detailed discussion supporting it, simply because the Board's opinion *also* discussed a pretext theory that, while less than persuasive, was unnecessary for the Board to reach.

For the foregoing reasons, we deny the petition for review and grant the cross-application for enforcement of the Board's order.

---

**7.** Petitioner cites the Board's decision in *Jordan Marsh Stores Corp.,* 317 N.L.R.B. 460 (1995), for the proposition that an employer proves its affirmative defense simply by showing that it reasonably believed that the employee engaged in misconduct at the level warranting termination. Of course, the relevant belief is the belief that the company had at the time it fired Matzan; that petitioner can show a reasonable basis for having fired Matzan now is rather unavailing if, at the time, petitioner was motivated only by antiunion animus.