# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 17, 2011         Decided December 23, 2011

No. 10-1398

WAYNEVIEW CARE CENTER AND VICTORIA HEALTH CARE
CENTER,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

1199 SEIU UNITED HEALTHCARE WORKERS EAST,
INTERVENOR

Consolidated with 10-1404

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*David F. Jasinski* argued the cause and filed the briefs for
petitioners.

*Zachary R. Henige,* Attorney, National Labor Relations
Board, argued the cause for respondent. With him on the brief
were *John H. Ferguson*, Associate General Counsel, *Linda
Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*,

Supervisory Attorney. *Amy H. Ginn*, Attorney, entered an appearance.

*Ellen Dichner* argued the cause and filed the brief for intervenor 1199 SEIU United Healthcare Workers East.

Before: ROGERS and GARLAND, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Wayneview Care Center and Victoria Health Care Center petition for review of a decision and order of the National Labor Relations Board, and the Board cross-applies for enforcement. The Board found, among other things, that the petitioners violated the National Labor Relations Act by implementing new terms and conditions of employment before reaching a lawful impasse in collective bargaining negotiations. Because substantial evidence supports the Board's findings, we deny the petition for review and grant the Board's cross-application for enforcement.

I

Wayneview and Victoria, separate companies that share ownership, operate nursing homes in New Jersey. SEIU 1199, New Jersey Health Care Union, represents the certified nursing assistants and housekeeping, laundry, and dietary employees at both facilities. In 2005, Wayneview and Victoria had separate contracts with the union due to expire on March 31 of that year. In February 2005, the parties began to negotiate successor contracts. The union initially negotiated with each employer separately, but after several meetings, the parties agreed to consolidate negotiations. Justin Foley was the first chief negotiator for the union. Vincent Tufariello, the chief operating

officer of both Wayneview and Victoria, was the chief spokesman for the employers.

The union made its first full economic proposal on May 10, 2005. It called for an annual wage increase of 4% for three years, more paid days off, and a decrease in work hours at Victoria. Under the proposal, the employers would participate in the union's own health insurance plan, with a contribution rate of 22.33% set by the plan's trustees. There was also a new formula to set the amount of pension contributions. Finally, the union sought a gradual reduction in the number of "no-frills" employees (employees who could choose higher wages in lieu of benefits).

The parties continued to meet and bargain over the following months. In July, the union assigned Foley to another position, and Larry Alcoff took over as the union's lead negotiator. He met with Tufariello for the first time on August 5, 2005, and presented a new proposal. That proposal contained some concessions: The union dropped its demand for a reduced work week, reduced its pension proposal, and delayed the start-date for participation in the union's health insurance plan. Although there was tentative agreement on some items, including wages for certain classes of employees, other items remained unresolved. When the parties met again on August 9, Tufariello told Alcoff that the two principal stumbling blocks in the way of a collective bargaining agreement were the union's proposals regarding no-frills employees and health insurance.

The parties convened on Thursday, August 18 for a "marathon" bargaining session that lasted until 3 a.m. the following day. Hr'g Tr. 242 (Sept. 27, 2006) (J.A. 95). At that session, which two mediators also attended, the union presented another new proposal containing several significant concessions. First, its proposal regarding wages no longer had specific dates

and percentages for increases; instead, it had only a general target to be reached by the end of the contract term. Second, the union changed its health insurance proposal. For the first time, it abandoned its demand that the employers participate in the union's health plan and agreed that employees could be covered by the employers' existing plan. Finally, the union dropped its proposal to decrease the number of no-frills employees. Thus, the union softened its position on the specific items that Tufariello had identified as the major obstacles to an agreement.

The employers' counterproposal also contained significant concessions. Alcoff felt that the August 19 session provided "a roadmap to a deal," Hr'g Tr. 243 (Sept. 27, 2006) (J.A. 95), and union president Milly Silva agreed that it was "probably the most productive" that had taken place, Hr'g Tr. 135 (Sept. 26, 2006) (J.A. 71). Alcoff gave his cell phone number to the mediator and employers' counsel so that negotiations could continue over the weekend. He did not hear back, however, until Monday evening, August 22. That night, the employers faxed a regressive proposal -- which they later claimed to be their "last best offer" -- and refused to bargain further. On September 6, or soon thereafter, the employers implemented the terms of that offer. Letter from Dennis Alessi to Larry Alcoff (Oct. 3, 2005) (J.A. 405).

Meanwhile, the union was preparing for concerted action at Wayneview and Victoria. On August 12, the union had sent statutorily required, ten-day notices to both facilities, *see* 29 U.S.C. § 158(g), stating that its members would engage in a "strike, picketing, or other concerted refusal to work" starting on August 23. Letter from Milly Silva to Margaret Nolan (Aug. 12, 2005) (J.A. 306); Letter from Silva to Michael Del Sordo (Aug. 12, 2005) (J.A. 307). In response, the facilities lined up potential replacements. But Nolan told the replacements that

they might never work at all and that the permanent employees could return at any time. Hr'g Tr. 889 (Dec. 4, 2006) (J.A. 200).

At Wayneview, the employees ultimately voted not to strike. Silva notified Wayneview by fax on August 22 that the employees would only engage in after-hours informational picketing, and that they intended to work their regular schedules. Fax from Silva to Tufariello (Aug. 22, 2005) (J.A. 312). Wayneview replied through counsel that, since it had already lined up temporary replacements, "there is no work for your members at Wayne[v]iew. Please advise your members not to report to work tomorrow morning." Fax from Alessi to Silva (Aug. 22, 2005) (J.A. 313). Employees who showed up on or after August 23 were not permitted to work. One employee who attempted to return, Margaly Pierre, was told that if she wanted to work at Wayneview, she "was to sign" a paper "to vote the union out." Hr'g Tr. 506-07 (Oct. 19, 2006) (J.A. 145).

At Victoria, the employees voted to strike for five days. They went on strike on August 23, and then, in a letter dated August 26, "unconditionally offer[ed] to return to work" on August 28. Fax from Alcoff to Del Sordo (Aug. 26, 2005) (J.A. 314). Victoria replied that employees would be allowed to work only if the union accepted the regressive offer faxed by the employer on August 22. Fax from Alessi to Alcoff (Aug. 26, 2005) (J.A. 315). Victoria further warned that, starting on September 6, it would unilaterally implement the August 22 offer and permanently replace striking workers. *Id.* As at Wayneview, Victoria did not permit its employees to work on August 28; instead, a supervisor informed them, "It's a lock-out." Hr'g Tr. 53 (Sept. 26, 2006) (J.A. 54).

The union filed four unfair labor practice charges against Wayneview and Victoria between July 1, 2005 and April 12, 2006. Thereafter, the NLRB's General Counsel issued a

consolidated complaint.  On July 26, 2007, an administrative law judge (ALJ) concluded that the employers had committed several unfair labor practices in violation of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*.  *Wayneview Care Ctr.*, 352 N.L.R.B. 1089, 1120 (2008) (ALJ Op.).  On August 26, 2008, a two-member panel of the Board largely affirmed the ALJ's decision.  *Id.* at 1089-90 (Board Op. I).  After the Supreme Court held in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), that two-member panels do not have authority to decide cases, a three-member panel adopted the earlier Board decision by reference and added additional analysis. *Wayneview Care Ctr.*, 356 N.L.R.B. No. 30 (Nov. 18, 2010) (Board Op. II).

The Board agreed with the ALJ that the employers failed to prove the parties had reached a lawful impasse, and that the employers violated the NLRA by implementing their August 22 offer without first having reached such an impasse. *Wayneview*, 352 N.L.R.B. at 1089 (Board Op. I).  The Board also agreed that the employers violated the Act by locking out their employees without a "legitimate and substantial business justification," by failing to reinstate employees upon their unconditional offer to return to work, and by attempting to coerce the union into accepting the August 22 offer.  *Id*. at 1089 n.3; 356 N.L.R.B. No. 30, at 1-2 (Board Op. II).  It further agreed that Wayneview violated the Act "[b]y promising employees a return to work and increased benefits if they signed a petition to decertify the Union."  352 N.L.R.B. at 1090 (Board Op. I).  We discuss these violations in detail below.  The Board also affirmed the ALJ's findings regarding a number of additional violations, which we address only summarily for the reasons stated in Part II.

7

II

Section 10(e) of the NLRA provides that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *see Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982). Because the petitioners concede that they failed to object to several of the ALJ's findings, and because they offer no extraordinary circumstances as an excuse, we grant the Board's cross-application for enforcement as to those findings without further discussion. The findings are: (1) that Wayneview violated the Act by telling employees to remove union buttons; by threatening to discharge employees for striking, wearing buttons, or talking to the union; and by suspending employee Marjorie Barnett for supporting the union; (2) that Victoria violated the Act by threatening to discharge employees for striking and threatening to permanently replace locked-out employees; by conditioning a contract and employees' return to work on the union's withdrawal of pending unfair labor practice charges; and by unilaterally withdrawing benefits from returning strikers because they engaged in a strike; and (3) that both Wayneview and Victoria violated the Act by denying the union access to their facilities. *See Wayneview*, 352 N.L.R.B. at 1089 n.2 (Board Op. I).

In addition, although they apparently did object below, the petitioners do not contest here that each of them violated the NLRA by refusing to provide the union with information relevant to bargaining and by refusing to meet with the union following the August 22 proposal. The Board is therefore also entitled to summary enforcement of the portions of its order relating to those violations. *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 n.3 (D.C. Cir. 2011).

III

The petitioners do contest the Board's determination that they violated section 8(a)(5) and (1) of the NLRA, 29 U.S.C. § 158(a)(5) & (1), by unilaterally implementing their August 22 offer in the absence of a lawful impasse.  Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees."  *Id*. § 158(a)(5).  "An employer violates this duty to bargain if, absent a final agreement or a bargaining impasse, he unilaterally imposes changes in the terms and conditions of employment."  *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1113 (D.C. Cir. 2001); *see Litton Fin. Printing Div., Inc. v. NLRB*, 501 U.S. 190, 198 (1991).[1]  A bargaining impasse is reached when "good faith negotiations have exhausted the prospects of concluding an agreement," *Taft Broad. Co.*, 163 N.L.R.B. 475, 478 (1967), and "there [is] no realistic possibility that continuation of discussion at that time would . . . [be] fruitful," *Am. Fed'n of Television & Radio Artists v. NLRB*, 395 F.2d 622, 628 (D.C. Cir. 1968).  The burden of establishing impasse lies with the party asserting it.  *PRC Recording Co.*, 280 N.L.R.B. 615, 635 (1986), *enf'd*, *Richmond Recording Corp. v. NLRB*, 836 F.2d 289 (7th Cir. 1987).  The Board considers a number of factors to determine whether impasse exists, including "'the bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of

---

[1]"An employer who violates section 8(a)(5) also derivatively violates section 8(a)(1), which makes it unlawful for an employer 'to interfere with, restrain, or coerce employees in the exercise of' their statutory labor rights." *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 309 n.5 (D.C. Cir. 2003) (quoting 29 U.S.C. § 158(a)(1)).

negotiations.'" *TruServ*, 254 F.3d at 1114 (quoting *Taft*, 163 N.L.R.B. at 478).

As we have noted many times before, our role in reviewing an NLRB decision is limited. "We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Mohave Elec. Coop., Inc. v. NLRB*, 206 F.3d 1183, 1188 (D.C. Cir. 2000) (internal quotation marks and citation omitted). Of particular relevance here -- because the existence of impasse is a question of fact -- is the statutory admonition that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). Moreover, as we have previously noted, "'in the whole complex of industrial relations[,] few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems.'" *TruServ*, 254 F.3d at 1115 (quoting *Am. Fed'n*, 395 F.2d at 627). Accordingly, this "court ordinarily defers to the Board's fact-finding as to the existence of a bargaining impasse," *id.* at 1115, "unless the finding is irrational or unsupported by substantial evidence," *Teamsters Local Union No. 175 v. NLRB*, 788 F. 2d 27, 30 (D.C. Cir. 1986).

The Board's determination that the petitioners failed to prove that the parties had reached impasse easily satisfies our deferential standard of review. The petitioners declared impasse soon after the marathon bargaining session of August 18-19. *See Wayneview*, 352 N.L.R.B. at 1114 n.60 (ALJ Op.). The ALJ found, however, that "[s]ignificant movement on major economic items of importance to both sides took place" during that session. *Id.* at 1113. "Both employer[s] and the Union

made major concessions and both made new and important changes to their basic approach to the bargaining." *Id*. More specifically, "[t]he Union's willingness to agree to continue the employer's health insurance plan and its willingness to abandon its previous insistence on phasing out no-frills employees met [the employers'] most important goals as expressed by Tufariello." *Id*. at 1113-14. On this basis, the ALJ concluded that "the parties were coming closer together on the major items about which they had disagreed in the past." *Id.* at 1114. The ALJ also noted that, after the August 18-19 session, Alcoff made efforts to contact the employers to negotiate further. Based on this fact, and the progress made at the marathon session, the ALJ found that "[t]he parties' contemporaneous understanding of the negotiations was that further bargaining would be fruitful." *Id*.; *see Taft*, 163 N.L.R.B. at 478 (noting that the parties' "contemporaneous understanding" is a relevant factor in evaluating the existence of impasse). All of these findings were themselves supported by substantial evidence, and together they support the Board's determination that the petitioners "failed to prove that the parties reached impasse," *Wayneview*, 352 N.L.R.B. at 1089 (Board Op. I).

The petitioners argue that, appearances aside, the union bargained in bad faith because it adhered rigidly to the terms of another contract -- known as the "Tuchman Agreement" -- that it had recently negotiated with other nursing facilities. The Tuchman Agreement contained a "most-favored nations" clause, and the petitioners contend the union regarded itself as bound to the terms of that agreement. Although it is true that some of the terms of the union's initial proposal resembled those of the Tuchman Agreement, that proposal also differed in several respects, including with regard to wages and paid time off. 352 N.L.R.B. at 1099 (ALJ Op.). Moreover, the Board reasonably concluded that the "most-favored-nations clause was not a bar to further movement." *Id*. at 1089 (Board Op. I). As noted

above, at the bargaining session immediately preceding the employers' declaration of impasse, the union made significant concessions on the very issues that the employers had identified as the most important obstacles to agreement.

The principal support for the employers' contention that the union acted in bad faith is the testimony of three witnesses, who claimed that the union was unwilling to negotiate variances from the Tuchman Agreement. But the ALJ expressly discredited all three of those witnesses. "'[W]e do not reverse the Board's adoption of an ALJ's credibility determinations unless . . . those determinations are hopelessly incredible, self-contradictory, or patently unsupportable.'" *United Food & Commercial Workers Union Local 204 v. NLRB*, 447 F.3d 821, 824 (D.C. Cir. 2006) (quoting *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 28 (D.C. Cir. 1998)). Because the petitioners offer no reason to overturn the ALJ's credibility determinations, we have no basis for doing so.[2]

The petitioners also contend that Foley, the union's first negotiator and a witness whom the ALJ did credit, admitted in his testimony that his superior, Alcoff, "surreptitiously controlled the negotiations and would not allow the Union's bargaining representatives to unilaterally accept any terms that

---

[2]The ALJ found one witness unreliable because she "often contradicted herself[,] . . . could not recall various subjects relating to the bargaining," and was "not truthful" about her attempts to replace SEIU 1199 with a rival union. *Wayneview*, 352 N.L.R.B. at 1097 (ALJ Op.). The ALJ did not credit the second witness because her testimony was "contrary to the documentary evidence." *Id.* And the ALJ declined to credit the third's testimony regarding the course of negotiations because he "did not recall many details and had a very vague recollection of the specific offers, their costs and the timing of the discussions." *Id*. at 1103; *see also id.* at 1112 n.56.

deviated from the standard Union proposals set forth in the [Tuchman] Agreement." Pet'r Reply Br. 6. But nothing in Foley's testimony supports this contention. Foley did say that Silva (the union's president) "was working with . . . Larry Alcoff in coordinating most of how the overall contract negotiations were going," Hr'g Tr. 1099 (Dec. 6, 2005) (J.A. 233), but he did not suggest that Alcoff or Silva told him not to deviate from the Tuchman Agreement. In fact, when Foley was expressly asked during cross-examination whether "there [was] any requirement that . . . the contracts for Victoria or Wayneview needed to mimic the language or terms of the Tuchman Agreement," or whether "anyone ever suggest[ed]" that they should, Foley replied, "No." *Id*. at 1115-16 (J.A. 237).

Finally, the petitioners assert that, notwithstanding progress on other issues, the parties ultimately deadlocked over the single critical issue of health insurance, which led to a complete impasse. Although under certain circumstances deadlock on a single issue can justify an overall finding of impasse, *see Dallas Gen. Drivers v. NLRB*, 355 F.2d 842, 845 (D.C. Cir. 1966), "[t]he Board has long distinguished between an impasse on a single issue that would not ordinarily suspend the duty to bargain on other issues and the situation in which impasse on a single or critical issue creates a complete breakdown in the entire negotiations." *Sacramento Union*, 291 N.L.R.B. 552, 554 (1988), *enf'd sub nom. Sierra Publ'g Co. v. NLRB*, 888 F.2d 1394 (9th Cir. 1989). "Only in th[e] latter context when there has been a complete breakdown in the entire negotiations, is the employer free to implement its last, best, and final offer." *Id*. The party asserting impasse bears the burden of proving not only that the deadlocked issue is critical, but that "there can be no progress on any aspect of the negotiations until the impasse relating to the critical issue is resolved." *CalMat Co.*, 331 N.L.R.B. 1084, 1097 (2000).

The petitioners have not made that showing here. Although they claim that the parties were deadlocked over the employers' participation in the union's health insurance plan, that claim fails for two reasons. First, the petitioners have not shown that the asserted deadlock over health insurance inhibited progress on any other aspect of the negotiations. And second, the evidence is that there was no deadlock: In the final bargaining session before the petitioners declared impasse, the union let go of its demand that the employer participate in the union's health insurance plan -- the precise issue that the petitioners claim created the impasse.

An employer violates section 8(a)(5) and (1) of the NLRA if it "unilaterally imposes changes in the terms and conditions of employment" before either final agreement or bargaining impasse. *TruServ*, 254 F.3d at 1113; *see Litton*, 501 U.S. at 198. Because substantial evidence supports the Board's finding that the parties had not reached impasse, we uphold the Board's ruling that the petitioners violated the NLRA by unilaterally implementing their August 22 offer.

IV

The petitioners also challenge the Board's determination that they violated section 8(a)(3), (5), and (1) of the NLRA by unlawfully locking out their employees without a "legitimate and substantial business justification," in an attempt to coerce the union into accepting the employers' so-called "last best offer" of August 22. *Wayneview*, 356 N.L.R.B. No. 30, at 1-2 (Board Op. II).[3] "When an employer locks out its employees for

---

[3]Section 8(a)(3) states that it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

the purpose of evading its duty to negotiate with the employees' bargaining representative," or to "coerce the [u]nion to accept the [employer's] unilaterally implemented final offer," the employer violates the Act. *Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1085 (D.C. Cir. 1991); *see also Anderson Enters.*, 329 N.L.R.B. 760, 766 (1999) (holding a lockout unlawful when "utilized to enable [the employer] to implement its own bargaining position without . . . genuine impasse"), *enf'd* 2 Fed. App'x 1 (D.C. Cir. 2001).[4]

Substantial evidence supports the Board's conclusion that the petitioners did just that. During the strike at Victoria, the petitioners' lawyer sent a fax to Alcoff advising that employees would not be allowed to return to work unless the union accepted the employers' August 22 offer. Fax from Alessi to Alcoff (Aug. 26, 2005) (J.A. 315). The ALJ reasonably determined that this "refusal to reinstate the strikers after their unconditional offer to return . . . constituted a lockout," that Victoria expressly conditioned the end of its lockout on the union's acceptance of the August 22 offer, and that "the employer was not entitled to impose a final offer because there was no valid impasse." *Wayneview*, 352 N.L.R.B. at 1119 (ALJ Op.).[5] Similarly, Margaret Nolan, Wayneview's administrator,

---

[4]Although the Supreme Court has held that an employer may lock out its employees "for the sole purpose of bringing economic pressure to bear in support of its legitimate bargaining position," *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318 (1965), the petitioners do not assert that they had such a purpose, *see Wayneview*, 356 N.L.R.B. No. 30, at 1 (Board Op. II).

[5]There is no merit to the petitioners' contention that the offer to return was not "unconditional" because the strikers refused to accept the terms of the August 22 offer. As the ALJ noted, the terms of the expired contract were still in place when the union went on strike, and the strikers were prepared to return to work on those terms. 352

sent a fax to Silva during the lockout announcing that Wayneview would also implement its August 22 offer during the lockout of its employees. Fax from Nolan to Silva (Aug. 31, 2005) (J.A. 322). And both employers ultimately did unilaterally implement the August 22 offer as threatened. Letter from Alessi to Alcoff (Oct. 3, 2005) (J.A. 405). Accordingly, the Board had substantial support on the record to rule that the lockouts violated the NLRA. 356 N.L.R.B. No. 30, at 1-2 (Board Op. II).

The petitioners counter that the lockouts were "'defensive' lockout[s] reasonably necessary to ensure continued patient care," *id*., and therefore lawful under *Sociedad Española de Auxilio Mutuo y Beneficiencia*, 342 N.L.R.B. 458 (2004), *enf'd*, 414 F.3d 158 (1st Cir. 2005). In *Sociedad*, the union notified a hospital that it intended to strike from December 22-24 and from December 31-January 2. *Id*. at 460. The facility decided to engage in a lockout between those two planned work stoppages. Although the union canceled its first strike at 8:15 p.m. on December 21 (the night before it was scheduled to occur), the employer moved the lockout up to December 22. The Board held that "continuity of patient care" was the lockout's "operative purpose," and that "this operative purpose . . . provide[d] the legitimate and substantial business justification" required to render it lawful. *Id*. at 461-62. In support, the Board noted that: the employer "could reasonably be concerned that the '11th hour' cancellation [of the first strike] would not be true and effective"; "replacements had already been hired" and thirty "were already sleeping in the hospital"; the employer "was still faced with a [second planned] strike for December 31"; and

N.L.R.B. at 1119 (ALJ Op.). It was the employers, not the union, that tried to impose a new condition: acceptance of the August 22 offer. Under these circumstances, the ALJ reasonably determined that the union had made a "a valid unconditional offer." *Id*.

recruiting personnel to work only during the holiday would be "difficult." *Id*. at 462.

None of those circumstances exists in this case. The ALJ noted that administrator Nolan's "unreliable and shifting" testimony did not evidence any firm commitment to the replacement workers at Wayneview, or any practical difficulties in notifying them of the union's decision not to strike. 352 N.L.R.B. at 1117 (ALJ Op.). There was no evidence that Wayneview would be financially liable if the replacement workers were turned away. And at Victoria, there was no testimony at all concerning a business justification for the lockout. *Id*. at 1119. Nor was there "evidence that the Union was planning another strike or further picketing at Victoria or that the Union would not adhere to its decision to limit concerted activity at Wayneview to 1 day of informational picketing during employees' nonworking time." 356 N.L.R.B. No. 30, at 1 (Board Op. II). In short, the ALJ persuasively distinguished *Sociedad*, and on that basis, the Board reasonably agreed that the employers had failed to show that the lockouts were "lawful 'defensive' lockout[s] reasonably necessary to ensure continued patient care." *Id*.

The petitioners insist that "substantial record evidence established that [they] lawfully locked out their employees for legitimate business reasons." Pet'r Br. 54. Even if this were a correct assessment of the record, its premise inverts the appropriate standard of review. The question before us is not whether substantial evidence supports the petitioners' view, but whether it supports the Board's. *See* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."). Because it does, our inquiry with respect to this violation is concluded.

## V

Finally, the petitioners dispute the Board's finding that, "[b]y promising employees a return to work and increased benefits if they signed a petition to decertify the Union, . . . Wayneview assisted employees in the solicitation of signatures on a petition to decertify the Union in violation of Section 8(a)(1) of the Act." *Wayneview*, 352 N.L.R.B. at 1090 (Board Op. I). An employer's "conduct violates § 8(a)(1) if it 'interfere[s] with, restrain[s], or coerce[s] employees' in their decision whether to decertify the union." *Exxel/Atmos, Inc. v. NLRB*, 147 F.3d 972, 974 (D.C. Cir. 1998) (quoting 29 U.S.C. § 158(a)(1)).

The Board's finding arose out of two separate allegations in the General Counsel's complaint. The first involved employee Margaly Pierre, who attempted to return to work at Wayneview during the lockout. According to Pierre's testimony -- which the ALJ credited and no witness contradicted -- director of nursing Nancy Ziccone asked her if she wanted to "work with Wayneview" or "work with the Union." Hr'g Tr. 504-05 (Oct. 19, 2006) (J.A. 145). Pierre replied that she was a single mother who needed a job and would choose to work. *Id.* at 505. Another supervisor told her that if she agreed to work without the union, she would get "free health benefits, health insurance, free paid vacation, free personal days, and free sick days." *Id.* at 506. Ziccone then gave Pierre a piece of paper with language to "vote the Union out," and told her that "if [she] were to work with Wayneview [she] was to sign the paper." *Id.* at 506-07. She did. The General Counsel's second allegation involved staffing coordinator Christopher Irizarry, whom the ALJ found had assisted in gathering signatures of locked-out employees on a decertification petition. *Wayneview*, 352 N.L.R.B. at 1115 (ALJ Op.).

18

The petitioners' opening brief does not address Ziccone's treatment of Pierre at all. Instead, its entire discussion concerns the allegation of misconduct by Irizarry. But that attack is misdirected, because the Board rested its affirmance of the ALJ's finding solely on the incident involving Pierre. It was "unnecessary to rely on the conduct of Wayneview's staffing coordinator, Christopher Irizarry," the Board said, because "[a]n additional violation based on Irizarry's conduct would be essentially cumulative and would not materially affect the remedy." 352 N.L.R.B. at 1089 n.3 (Board Op. I). Although the petitioners do finally address the Pierre incident in their reply brief, that argument comes too late. *See N.Y. Rehab. Care Mgmt. v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) ("[W]e have generally held that issues not raised until the reply brief are waived." (citation and internal quotation marks omitted)). It is also wholly unpersuasive. "There is no question" that an employer "promising better economic benefits" to employees or "threatening [them] with the loss of their jobs" to induce them to sign a decertification petition constitutes "ample grounds for a violation of section 8(a)(1) of the Act." *NLRB v. Maywood Plant of Grede Plastics*, 628 F.2d 1, 3 (D.C. Cir. 1980); *see Exxel/Atmos*, 147 F.3d at 974.

VI

For the foregoing reasons, we deny the petition for review and grant the Board's cross-application for enforcement.

*So ordered.*