# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 9, 2011       Decided January 20, 2012

No. 10-1340

LAUREL BAY HEALTH & REHABILITATION CENTER,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 10-1405

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations
Board

*David F. Jasinski* argued the cause for the petitioner.

*Zachary R. Henige*, Attorney, National Labor Relations
Board, argued the cause for the respondent. *John H. Ferguson*,
Associate General Counsel, *Linda Dreeben*, Deputy Associate
General Counsel, *Jill A. Griffin*, Supervisory Attorney, and
*Richard A. Cohen*, Attorney, were on brief.

Before: HENDERSON, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Petitioner Laurel Bay Health and Rehabilitation Center (Laurel Bay) seeks review of a decision of the National Labor Relations Board (NLRB, Board) affirming the findings of an administrative law judge (ALJ) that Laurel Bay committed eight unfair labor practices (ULPs) in violation of section 8(a)(1) and (5) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (5). *See Laurel Bay Health & Rehab. Ctr.*, 353 N.L.R.B. 232, 232 n.3, 39 (ALJ) (2008) (*Laurel Bay I*), *incorporated by reference in Laurel Bay Health & Rehab. Ctr.*, 356 N.L.R.B. No. 3, 2010 WL 4227855 (2010) (*Laurel Bay II*). The Board filed a cross-application for enforcement. We grant Laurel Bay's petition in part and set aside the Board's findings that Laurel Bay committed ULPs when it prematurely declared impasse and unilaterally implemented a wage increase on September 1, 2005[1] for the reasons set forth below. We deny the petition and grant enforcement as to the remaining ULP findings because Laurel Bay has forfeited any objection thereto.[2]

---

[1]Unless otherwise noted all dates cited are in 2005.

[2]The remaining six ULPs are based on allegations that Laurel Bay (1) unilaterally terminated a nursing assistant's "accommodation schedule" that allowed her to work a non-standard shift one day each week to attend a class; (2) unilaterally announced the termination of all accommodation schedules; (3) unilaterally terminated a transportation service it provided for certain nurses' aides; (4) refused to meet for bargaining after October 4, 2005; (5) unilaterally implemented merit pay raises; and (6) failed to provide information requested by the SEIU 1199 New Jersey Health Care Union (Union) on August 31, 2005 and thereafter. Laurel Bay forfeited its objections to the first two alleged ULPs because it failed to except to them before the Board. *See Laurel Bay I*, 353 N.L.R.B. at 232 n.1; 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary

## I.

Laurel Bay operates a nursing home and rehabilitation center in Keansburg, New Jersey. From 1999 until 2005, SEIU 1199 New Jersey Health Care Union (Union) represented 82 Laurel Bay employees in a collective bargaining unit consisting of full-time and regular part-time licensed practical nurses, nurses aides, recreational aides, beauticians, housekeeping aides,

---

circumstances."). Laurel Bay forfeited the third through fifth objections because it did not provide any legal argument in its opening brief to support overturning either the third and fourth ULPs or the fifth ULP insofar as the Board based the fifth ULP on *McClatchy Newspapers, Inc.*, 321 N.L.R.B. 1386, 1391 (1996). *See Laurel Bay I*, 353 N.L.R.B. at 248 (ALJ) (assuming impasse occurred, Laurel Bay could not lawfully implement discretionary merit pay plan under *McClatchy* because "[a]llowing the employer to implement upon impasse a clause that reserved the right to unilaterally exert unlimited managerial discretion over future pay increases [']would be so *inherently* destructive of the fundamental principles of collective bargaining that it could not be sanctioned as part of a doctrine created to break impasse and restore active collective bargaining.' " (quoting *McClatchy Newspapers*, 321 N.L.R.B. at 391)) (quotation mark omitted); *id.* at 232 n.3 (adopting ALJ's "contested findings of violations"); *Laurel Bay II*, 2010 WL 4227855, at *1 (incorporating *Laurel Bay I*); *Dunkin' Donuts Mid-Atlantic Distrib. Ctr., Inc. v. NLRB*, 363 F.3d 437, 441 (D.C. Cir. 2004) (enforcing rule that "argument portion of an appellant's opening brief 'must contain' the 'appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.' " (quoting Fed. R. App. P. 28(a)(9)(A))). Finally, because the "duty to provide relevant information needed by a labor union for the proper performance of its duties as the employees' bargaining representative" arises from the "duty to bargain collectively," *U.S. Testing Co. v. NLRB*, 160 F.3d 14, 19 (D.C. Cir. 1998) (quotation omitted), we find the seventh ULP forfeited on the same basis as the fourth. In finding Laurel Bay forfeited its objections, we express no opinion on the merits of the alleged ULPs.

laundry employees and dietary employees. In early 2005, Laurel Bay and the Union began negotiating a successor collective bargaining agreement. Under the previous five-year agreement, in effect from October 1999 through September 2004, unit members were initially covered under Laurel Bay's health insurance plan. In October 2003, however, the parties entered into an "extension" agreement which extended the contract through March 2005. In addition, the extension agreement transferred the unit employees' health coverage from Laurel Bay's employee health insurance plan to the Union's SEIU 1199 Greater New York Benefit Fund (Benefit Fund)[3] and required Laurel Bay to contribute a percentage of its gross unit payroll to the Benefit Fund. The initial contribution was set at 12%, increasing on February 1 to 16% and on April 1 to 18% .[4]

The parties conducted eight bargaining sessions in 2005 in an effort to forge a successor collective bargaining agreement. Laurel Bay was represented primarily by its counsel, David F. Jasinski, with the assistance of Laurel Bay's finance director, David Dennin, and human resources director, Linda Meehan. The Union was represented by a succession of three individuals: Uma Pimplaskar, Justin Foley and Larry Alcoff.

Pimplaskar represented the Union at the first two bargaining sessions. At the first, which took place in February, she presented Laurel Bay with a contract proposal which, inter alia,

---

[3]The Benefit Fund is managed by a Board of Trustees (Trustees), half of whom are designated by employers and half by the Union. *Atrium at Princeton, LLC*, 353 N.L.R.B. No. 60, 2008 WL 5134010, at *56 n.10 (2008) (ALJ), *adopted by Atrium at Princeton, LLC*, 356 N.L.R.B. No. 6, 2010 WL 4318370 (Oct. 22, 2010).

[4]The extension agreement also authorized Laurel Bay to hire up to 25 "no frills" or "per diem" employees, i.e., employees who receive no benefits under the collective bargaining agreement.

provided for increased contributions to the Benefit Fund.[5] Under the proposal, beginning May 1, Laurel Bay was to contribute 21% of gross unit payroll to the Benefit Fund, with the percentage to be adjusted by the Benefit Fund trustees "as necessary to maintain the level of benefits currently provided or as improved by the Trustees during the life of the Agreement" but "in no event" to exceed 24% of gross unit payroll.[6] Resp't ex. 1 at 7 (JA 163). According to Jasinski's uncontradicted testimony, Pimplaskar told him "there were certain provisions in their proposals that would not be negotiable, that she would not even hear any discussions about," including the Benefit Fund contribution requirement. Hearing Tr. 436 (JA 120). Jasinski also testified she told him the Union was then negotiating 40 to 45 contracts with a group of 20 New Jersey nursing homes represented by lawyer Morris Tuchman (Tuchman Group) and any agreement reached with Laurel Bay would have to be approved by a "master committee" made up of employees at other facilities. Finally, she requested that Laurel Bay provide a list of unit employees, their rates of pay, hours worked and dates of hire.

The parties met for a second session on March 9, at which time Laurel Bay presented a written counter-proposal addressing

---

[5]The proposal was delivered at least in oral form at the first session. Jasinski testified he was uncertain whether Pimplaskar presented the written version at the first or the second session.

[6]The proposal also provided that Laurel Bay contribute 2½% of each unit employee's gross earnings to the Union's national pension fund, ½% to its Training and Education Fund and ½% to the New Jersey Healthcare Workers Alliance for Quality in Long Term Care. It also contained provisions addressing non-economic subjects such as Union activities and communications, seniority, layoff and recall, transfer and promotion, discipline and discharge and labor-management committees. It did not include a wage proposal.

non-economic issues, including overtime eligibility, part-time employee criteria and grievance and arbitration procedures. According to Jasinski, Pimplaskar informed him then that the Union's proposal was the "standard contract"—which Jasinski interpreted to mean the contract then being negotiated with the Tuchman Group—and that it was the contract the Union was "going to negotiate" and was "going to get." Hearing Tr. 445 (JA 123). On March 21, Alcoff notified Jasinski that Foley was replacing Pimplaskar as chief Union negotiator.

Foley met with the Laurel Bay representatives for the first time in mid-May. He testified at the ALJ hearing that, during the 2½ hour meeting, the parties merely reviewed outstanding information requests and proposals that were already "on the table." Hearing Tr. 45 (JA 43).

The next meeting, on June 3, lasted about three hours. The parties again addressed information requests and they discussed non-economic contract terms but failed to reach any agreement. They also signed a "memorandum of agreement"—extending the existing contract through June 30—and scheduled another bargaining session.

On June 17, Foley met again with the Laurel Bay negotiating team and tendered a revised economic proposal on the Union's behalf. The proposal, inter alia, set a Benefit Fund contribution rate of 22.33% of gross unit payroll and annual wage increases of 4%.[7] According to Jasinski, Foley stated the Union could not "deviate" from or "make any changes" to a

---

[7]In addition, the proposal set contribution rates for the other Union funds, prohibited hiring new "no frills" employees and established minimum "parity" pay for lower paid employees—housekeeping and dietary workers, in particular—intended to bring their pay up to "industry" levels by the contract's end date. *See* Resp't Br. 8, 14-15.

number of provisions in the Tuchman "Master Contract,"[8] including the Benefit Fund contribution requirement, because the Tuchman Master Contract included a "most favored nations" clause requiring any concession the Union granted Laurel Bay it "would have had to give [] to everyone else." Hearing Tr. 452 (JA 124). Thus, according to Foley, the Union's hands were "tied." *Id.*[9] According to Dennin's testimony, Foley said the 22.33% Benefit Fund contribution in particular was "set in stone." Hearing Tr. 549 (JA 147).

When the negotiators met again on July 8, Jasinski presented Foley with Laurel Bay's own economic proposal, proposing a Benefit Fund contribution of 16% of gross unit payroll (through the entire contract term), wage increases of 3% in October 2005 and October 2006 and 2% in April 2007 and October 2007 and an annual discretionary "merit bonus or merit

---

[8]The Tuchman Master Contract was the final negotiated three-year contract agreed to by the Union and the 20 facilities in the Tuchman Group. It took effect on June 15, 2005.

[9]The Tuchman Master Contract contained the following relevant most favored nations language:

> In the event the Union enters into any collective bargaining agreement . . . on or after April 1, 2005 with a proprietary nursing home in New Jersey which provides for more favorable economic terms and conditions to the employer than those contained herein, such more favorable terms and conditions shall automatically be applicable to the Employers [signatory to the Tuchman Master Contract] . . . .

Resp't ex. 23 at 29, art. 35, ¶ 35.2 (JA 251) (agreement between SEIU 1199 New Jersey Health Care Union and Arnold Walter Nursing Home *et al.*).

pay" plan.[10] Foley testified they did reach agreement on some non-economic issues but not on the key economic points. According to Dennin, Foley was "adamant" about the 22.33% Benefit Fund contribution because "that is what he [had] gotten at other facilities and that is what he w[ould] get at all of his facilities." Hearing Tr. 552 (JA 147). According to Dennin, Jasinski responded: "Laurel Bay is Laurel Bay and he didn't care what [Foley] negotiated with other owners at other facilities." They scheduled another session for July 16 which Foley subsequently cancelled because by then he had left the local Union's employ. Foley's notes written after the July 8 meeting indicated Laurel Bay did not "seem to be making any money" and quoted Jasinski as calling Laurel Bay "broke" because its resident census was low at only 70%. Resp't ex. 18 (JA 214).

On August 5, the negotiators convened again after Alcoff replaced Foley as the Union's chief negotiator. During the session, Alcoff and Jasinski reached a tentative agreement on a number of non-economic issues. In addition, Alcoff presented a written counter offer of economic proposals, which again set a Benefit Fund contribution rate of 22.33% but with the additional proviso that, if 22.33% was insufficient to cover costs, the parties would meet and either adjust benefits or make other revisions (with final and binding arbitration in the event they could not agree). "In no event," however, could "the contribution requirement of the Employer exceed 22.33% of gross payroll . . . except by mutual agreement." Gen. Counsel ex. 7, art. 31, ¶ 31.1 (JA 415). The ALJ found the counter

---

[10]Laurel Bay also proposed new criteria for setting new hires' wages, new hourly rates for no-frills employees and little or no change in sick/holiday/vacation days.

offer's Benefit Fund provision and certain other terms[11] were "identical" or "virtually" so to those in the Tuchman Master Contract.  *Laurel Bay I*, 353 N.L.R.B. at 237.  According to Jasinski, Alcoff told him the Union was "going to get the Tuc[h]man contract" and relied on that contract's most favored nations clause to justify the Union's refusal to consider other proposals.  Hearing Tr. 469 (JA 129); *see also id*. at 474 (JA 130) (Alcoff "kept on referring to [the Union's] desires to negotiate the standard agreement").  Alcoff acknowledged that, although there were some facility-specific variations in the Tuchman Master Contract, all 20 of the signatory employers were required to make a Benefit Fund contribution of 22.33%.  According to Dennin, both he and Jasinski responded that the proposed rates were "too much" and "too high" because of Laurel Bay's  "very low" census, with 23 of its 123 beds then empty.  Hearing Tr. 553-54 (JA 148).

The parties held their final bargaining session on August 23.  At that time, Laurel Bay orally modified its July 8 proposal, moving the October 1, 2005 3% wage increase up to August 14.  Alcoff testified that they had "a back and forth discussion, briefly, on the health insurance, again" during which Dennin stated he "didn't want to pay any more than he was currently paying for health insurance, and with the raises on the table, 16 percent of a higher gross payroll would equal his current 18 percent of a lower gross payroll pre-raises."  Hearing Tr. 154 (JA 68).  Alcoff responded that Dennin's suggestion was "not going to be possible" and that there was "no way that they were going to be able to stay in the [Benefit Fund] at the rate that they were proposing."  Hearing Tr. 154, 186 (JA 68, 76).  Alcoff stated that he asked Jasinski what he would do if the Benefit Fund rejected Laurel Bay's 16% contribution offer and Jasinski

---

[11]These included the proposal's no-frills employee and wage increase terms.

replied that "that was [Alcoff's] problem." *Id*. at 187 (JA 76). Alcoff added that if Laurel Bay was unwilling to pay any more than the amount it offered, the Union "had to look for other health insurance." Hearing Tr. 154 (JA 68). According to Alcoff's testimony, Alcoff asked Jasinski: "What do you offer the non-Union employees?" Hearing Tr. 86-87 (JA 76)—and suggested the negotiators "ought to look at other plans." Hearing Tr. 187 (JA 76).

At Alcoff's suggestion, he and a Laurel Bay unit employee joined Jasinski and Dennin in Laurel Bay's caucus room for an "off-the-record discussion," which Alcoff characterized as "very, very unproductive." Hearing Tr. 155-56 (JA 68). After Alcoff and the employee returned to the bargaining room, Jasinski joined them and declared that Laurel Bay's outstanding July 8 offer (as orally amended to accelerate the first pay raise) was Laurel Bay's "last and best final offer." Hearing Tr. 476 (JA 130); *see also id*. at Tr. 157 (JA 69); 353 N.L.R.B. at 239, 241. Alcoff testified he expressed surprise because they had had "virtually no discussion on economic issues." Hearing Tr. 158 (JA 69). He then questioned Jasinski at length about Laurel Bay's other contract proposals—how they might be applied and how much money they would save Laurel Bay. In conclusion, Alcoff testified, he said to Jasinski:

> I will tell you that we are not at impasse in this discussion. There's wiggle room on the proposal. But, clearly, we need to know a lot of answers to these kinds of questions, now that we're apparently surprisingly at the end of bargaining, out of the blue. . . . [W]e would like to schedule another session. We will need information, because, frankly, we need to know in real terms what the impact of this will be both on our members and to the employer, so we can cost it out against our proposal and make a comprehensive counter-proposal.

Hearing Tr. 169 (JA 72). Jasinski responded he did not have his calendar with him to schedule another session but would call the Union local later to do so.

On August 31, Alcoff wrote Jasinski that he was "preparing a comprehensive counterproposal on the remaining open issues" and requested information, including the summary plan descriptions of Laurel Bay's non-unit employee health plans and the amounts of their premiums (for employer and employee). Gen. Counsel ex. 8 (JA 417). The next day, September 1, Laurel Bay implemented a 3% pay raise in accord with its July 8, economic proposal, as amended on August 23 (accelerating the date of the raise). Alcoff immediately sent a fax to Jasinski expressing "shock[]" that Laurel Bay unilaterally implemented the increase, asking if Laurel Bay had implemented any other provisions in its proposal and declaring: "We are clearly not at impasse." Gen. Counsel ex. 9 (JA 418). The two exchanged correspondence regarding possible meeting dates until January 2007 but did not meet again. In his final letter, dated January 10, 2007, Alcoff complained that Laurel Bay "unilaterally implemented a 'merit bonus' for bargaining unit employees in December 2006," which it apparently had done. Gen. Counsel ex. 24 at 1 (JA 434).

The Union filed a series of unfair labor practice charges against Laurel Bay from November 2005 to May 2006. On February 2, 2007, the Board's General Counsel filed a Third Amended Consolidated Complaint alleging Laurel Bay violated section 8(a)(5) and (1) of the Act by failing to provide the Union with requested information, refusing to meet for bargaining at reasonable times and unilaterally implementing changes in terms of employment without first bargaining to impasse.[12] The ALJ conducted a hearing in February-March 2007.

---

[12]For a list of the unilateral changes other than the wage increase, *see supra* p. 2 note 2.

In his June 8, 2007 decision, the ALJ concluded Laurel Bay violated section 8(a)(1) and (5) in all respects alleged based on two alternate rationales. First, the ALJ concluded that there was no impasse, relying on Alcoff's conduct at the final bargaining session both *before* Jasinski declared Laurel Bay's latest offer to be its "last and best final offer"—when Alcoff mentioned "other health insurance" and Laurel Bay's "non-Union employees," Hearing Tr. 154, 186-87 (JA 68, 76); and *after* Jasinski's declaration—when Alcoff questioned him about the terms of Laurel Bay's offer, denied there was an impasse, claimed there was "wiggle room on the proposal" and expressed a desire to schedule another bargaining session so the Union could make "a comprehensive counter-proposal," *id.* at 169 (JA 72). *Laurel Bay I*, 353 N.L.R.B. at 245. Alternatively, the ALJ reasoned that if there was an impasse, it was broken by the discourse following Jasinski's declaration, *id.* at 247. In either event, he concluded, Laurel Bay violated the Act when it unilaterally implemented the various changes in the absence of an impasse. He further concluded Laurel Bay unlawfully refused to supply requested information after the last session or to meet for further bargaining.

In a decision filed September 30, 2008, a two-member panel of the NLRB upheld the ALJ, finding that "the parties had not reached an impasse in bargaining, and that [Laurel Bay] violated Section 8(a)(5) when it unilaterally implemented various changes in the employees' terms and conditions of employment." 353 N.L.R.B. at 233. The Board explained:

> Rather than evincing the existence of a bona fide impasse over health insurance as of August 23, the record shows that the parties had agreed to meet again, that the Union would be preparing counterproposals, and that there was at least professed flexibility on health insurance alternatives.

*Id*. Laurel Bay petitioned for review. We held the case in abeyance pending the United States Supreme Court's decision in *New Process Steel, L.P. v. NLRB, cert. granted*, 130 S. Ct. 488 (2009). On June 17, 2010, the Supreme Court issued its decision in *New Process Steel*, 130 S. Ct. 2635 (2010), holding that a two-member panel of the Board lacks statutory authority to act on the Board's behalf. Accordingly, on September 20, 2010, we granted the petition for review, vacated the Board's decision and "remanded for further proceedings before the Board." *Laurel Bay Health & Rehab. Ctr. v. NLRB*, No. 08-1337 (D.C. Cir. Sept. 20, 2010).

On remand, a three-member panel of the Board succinctly decided:

> The Board has considered the judge's decision and the record in light of the exceptions and brief and has decided to affirm the judge's rulings, findings, and conclusions and to adopt the recommended Order to the extent and for the reasons stated in the decision reported at 353 NLRB 232, which is incorporated herein by reference.

*Laurel Bay II*, 2010 WL 4227855, at *1 (Oct. 15, 2010). Laurel Bay filed a timely petition for review and the Board filed a cross-application for enforcement.

## II.

Section 8(a)(5) makes it an ULP for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). "An employer violates this duty to bargain if, absent a final agreement or a bargaining impasse, he unilaterally imposes changes in the terms and conditions of employment." *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1113 (D.C. Cir. 2001). In this case, we believe the Board erred in upholding the ALJ's finding that the parties were not at impasse when Jasinski presented Laurel Bay's "last and best

final offer" on August 23. Further, we conclude the Board also erred in finding Laurel Bay committed an ULP when it subsequently implemented its proposed 3% pay raise on September 1.

"A bargaining impasse—which justifies an employer's unilateral implementation of new terms and conditions of employment—occurs when 'good faith negotiations have exhausted the prospects of concluding an agreement' leading both parties to believe that they are 'at the end of their rope.' " *Id.* at 1114 (quoting *Taft Broad. Co.,* 163 N.L.R.B. 475, 478 (1967); *PRC Recording Co.,* 280 N.L.R.B. 615, 635 (1986)). "Among the factors that the Board considers in evaluating the existence of an impasse are 'the bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations.' " *Id*. (quoting *Taft,* 163 N.L.R.B. at 478). "After weighing these factors, the Board will find an impasse if there is 'no realistic possibility that continuation of discussions . . . would have been fruitful.' " *Id*. (quoting *Am. Fed'n of Television & Radio Artists v. NLRB,* 395 F.2d 622, 628 (D.C. Cir. 1968)). Such is the case here.

From start to finish, the parties were at loggerheads over the amount of Laurel Bay's contribution to the Benefit Fund. As the ALJ found, their "course of bargaining demonstrates that the Union never proposed a Benefit Fund increase which was lower than the raise ultimately agreed to in the Tuchman agreement—22.33%, and [Laurel Bay] consistently insisted that it would not agree to a higher rate than its offer of 16%." 353 N.L.R.B. at 245 (footnote omitted). Thus, as the ALJ acknowledged, when the parties entered the final bargaining session on August 23, "all the elements of a genuine impasse in bargaining were in place." *Id*. at 246. And so it played out. Dennin and Jasinski repeated their insistence on a contribution

rate of 16% and Alcoff responded it was "not going to be possible" and there was "no way" Laurel Bay could remain in the Union's Benefit Fund at that rate. Hearing Tr. 154, 186 (JA 68, 76). And neither party budged before Jasinski, upon his return from the caucus room, unequivocally declared Laurel Bay's existing proposal—including the 16% contribution rate—to be its last, best and final offer. At this point, the seeds of impasse had come to fruition.

On review, the NLRB acknowledged that "[i]mpasse over a single issue may create an overall bargaining impasse that privileges unilateral action if the issue is 'of such overriding importance' that it frustrates the progress of further negotiations" and that "the Benefit Fund contributions clearly constituted such an issue." 353 N.L.R.B. at 232-33 (quoting *CalMat Co.*, 331 N.L.R.B. 1084, 1097 (2000)). The Board further recognized that "throughout most of the negotiation sessions, the parties remained steadfastly fixed in their respective positions: the Union adhering to the Tuchman agreement terms, and the Respondent refusing to contribute more than 16 percent of payroll" and that "[h]ad that status quo persisted, an overall impasse might well have been achieved." *Id*. at 233. But the Board found that the status quo "did not persist," *id*.—a finding we cannot uphold because it is not supported by substantial evidence. *See TruServ*, 254 F.3d at 1115 ("court ordinarily defers to the Board's fact-finding as to the existence of a bargaining impasse," but "court must be satisfied that the Board's findings are supported by substantial evidence on the record considered as a whole").

In *TruServ*, the employer too made a "last, best and final offer" but the Board concluded "the parties had not bargained to impasse before the [employer] unilaterally implemented changes in the unit employees' terms and conditions of employment" because "until the [employer] abruptly claimed that its 'last, best and final offer' was on the table and would be implemented

unilaterally if not accepted, both the [employer] and the Union had demonstrated considerable flexibility and willingness to compromise their positions." 254 F.3d at 1114 (quotation marks omitted). The employer petitioned the court for review and we granted the petition as to the impasse finding. We concluded that "nothing in the record negate[d] [the employer's] classification of its [] proposal as its 'last, best, and final offer.' " *Id.* at 1115. Similarly here—after six months of negotiation—the parties in August 2005 remained as far apart on the Benefit Fund contribution issue as they were when talks began in February.

At oral argument, the Board's counsel argued at length that the "context" of the final August 23 meeting—i.e., the entire course of the parties' bargaining—reinforced that the parties were not at impasse. This argument runs contrary to both the ALJ's and the Board's characterizations of the parties' consistent adherence to their respective positions on the Benefit Fund contribution up to the August 23 session, when, as both the ALJ and the Board acknowledged, the parties were poised for impasse. *See* 353 N.L.R.B. at 233 (Board); *id.* at 245 (ALJ). In finding no impasse, the Board largely ignored the parties' bargaining history and focused instead on their post-impasse conduct—what the Union did and what Laurel Bay did not.[13] On

---

[13]The Board largely ignored the four *Taft* factors, *supra* p. 14, relying on only one—the contemporaneous understanding of the parties—and that only briefly. *See* 353 N.L.R.B. at 245-46. Yet Jasinski's declaration of Laurel Bay's last, best and final offer and Alcoff's rejection of the offer show that their contemporaneous understanding practically shouted impasse. *TruServ*, 254 F.3d at 1117. Nor does Alcoff's denial of impasse belie such an understanding. *See id.* ("[A] bald statement of disagreement by one party to the negotiations is insufficient to defeat an impasse. A contrary result would render the 'contemporaneous understanding' *Taft* factor meaningless.").

the Union's part, the Board pointed to Alcoff's statements that "the Union was prepared to consider alternative medical insurance proposals, including the health care plan covering [Laurel Bay]'s nonunion employees" and that "the Union would be preparing a counterproposal." 353 N.L.R.B. at 233. To the extent a proposal may be inferred from Alcoff's vague comments before Jasinski declared Laurel Bay's "last and best final offer," —suggesting the parties might have to "look for other health insurance" and asking about health plans offered "non-Union employees," Hearing Tr. 154, 186-87 (JA 68, 76)—it was emphatically rejected by Jasinski's declaration. And his post-declaration statements simply came too late, after impasse had already been reached.[14] In any event, " '[t]he Board itself has indicated that a party's "bare assertions of flexibility on open issues and its generalized promises of new proposals [do not clearly establish] any change, much less a substantial change" in that party's negotiation position.' " *TruServ*, 254 F.3d at 1117 (quoting *Serramonte Oldsmobile, Inc. v. NLRB,* 86 F.3d 227, 233 (D.C. Cir. 1996) (quoting *Civic Motor Inns,* 300 N.L.R.B. 774, 776 (1990))) (brackets in *TruServ*). Here, Alcoff's twelfth-hour protestations and posturing did nothing to negate the culmination in impasse of 6 months' fruitless bargaining. *See id.* ("Furthermore, the Union's 'conduct' on which the Board relies—the Union's self-serving statement . . . that the parties were not at impasse and the Union's vacuous request . . . for

---

[14]Although the ALJ found that if there was an impasse, it was subsequently broken by Alcoff's near-soliloquy, *Laurel Bay I*, 353 N.L.R.B. at 245, the Board appears not to have adopted the finding. *See id.* at 232 ("For the reasons set forth below, we agree with the judge that [Laurel Bay] violated Section 8(a)(5) and (1) of the Act *by prematurely declaring impasse* and unilaterally implementing certain changes to its employees' terms and conditions of employment." (emphasis added)). In any event, the Board does not rely on the broken impasse rationale now.

additional meetings—is insufficient to demonstrate the Union's desire to pursue further negotiations."). They did not "actually commit[] the Union to a new position or contain[] any specific proposals." *Serramonte*, 86 F.3d at 233. In total, they "offer about as much as a handful of air" to support the Board's finding of no impasse. *Id*. There is no suggestion in the record that Laurel Bay was willing to retreat from its consistent insistence on a 16% contribution rate or that the Union would move toward it. *See TruServ*, 254 F.3d at 1116 ("In short, the parties remain in control of their negotiations, and each party, not the Board, determines at what point it ceases to be willing to compromise."). There was no movement at all here—merely the persisting status quo.[15]

As for Laurel Bay, the Board faults it for failing to "test the Union's stated willingness to move, consider a union counterproposal, or follow through with an additional negotiation session" and the "sincerity" of its "professed flexibility on health insurance alternatives." 353 N.L.R.B. at 233. We rejected just such a requirement, however, in *Serramonte*. There, the ALJ "placed the burden on [the employer] to 'contemplate whether the Union was reconsidering'" by "probing [its] frankness." 86 F.3d at 233 (quoting *Serramonte Oldsmobile, Inc.*, 318 N.L.R.B.

---

[15]Nor is the Board's finding of no impasse supported, as it claims, by "evidence at the hearing establish[ing] that the Union, in fact, agreed to contracts with six other nursing homes in New Jersey that did not include the Benefit Fund as the insurance plan for unit employees." *Laurel Bay I*, 353 N.L.R.B. at 233; *see, e.g.*, Resp't ex. 23 at 67 (JA 289) (arbitral award in *New Vista Nursing & Rehab. Ctr.*). Such post hoc evidence sheds no light on the "'*contemporaneous* understanding of the parties as to the state of negotiations'" at the August 23, 2005 bargaining session. *Taft,* 163 N.L.R.B. at 478 (emphasis added). Moreover, the parties here never agreed to consider other plans nor was there any movement on the contribution rate.

80, 97 (1995)).  We found the Board's approach "reflect[ed] a clear misunderstanding of the relevant inquiry" because "there is absolutely no basis for requiring a negotiating party to probe the sincerity of another party's contentless statements after an impasse has already been reached."  *Id.*  Yet this is exactly the burden the Board once again imposed in this case.  And just as wrongly.  Once Jasinski made his declaration and impasse was reached, the burden lay on the Union to show "changed circumstances."  *See id.* at 233 ("[I]t is incumbent on the party asserting that the impasse has been broken to point to the changed circumstances that would justify such a finding.").  The Union did not meet its burden when it failed to produce substantial evidence of such a change.[16]

---

[16]In a post-argument letter submitted pursuant to District of Columbia Circuit Rule 28(j), the Board asserts its impasse finding is supported by the court's recent decision in *Wayneview Care Center v. NLRB*, Nos. 10-1398 et seq. (D.C. Cir. Dec. 23, 2011).  The Board contends that here, as in *Wayneview*, "the Union . . . let go of its demand that the employer[] participate in the Union's health insurance plan" and the court should therefore uphold the Board's finding that, like the employers in *Wayneview*, Laurel Bay "did not bargain to a good-faith impasse."  Rule 28(j) letter at 1 (filed Dec. 28, 2011).  The parties' bargaining posture in *Wayneview*, however, was manifestly different.  At the time of the alleged impasse in *Wayneview*, the union had made "major concessions" on what the employers asserted were the "two principal stumbling blocks in the way of a collective bargaining agreement": the union's proposal to reduce the number of "no-frills" employees and its insistence on a 22.33% contribution to the Benefit Fund.  *Wayneview*, slip op. at 10, 3.  The union had, as we observed, "softened its position on the specific items that [the employers] had identified as the major obstacles to an agreement."  *Id.* at 4.  The employers had likewise made "significant concessions" before they abruptly, with no explanation, presented "a regressive proposal—which they later claimed to be their 'last best offer.' "  *Id.* Under these facts, we upheld the Board's determination that "[t]he parties' contemporaneous understanding of the negotiations was that

For the foregoing reasons, we conclude the record establishes the parties reached an impasse during the August 23, 2005 bargaining session. Accordingly, we grant Laurel Bay's petition for review regarding the Board's findings that Laurel Bay committed unfair labor practices in violation of section 8(a)(1) and (5) of the National Labor Relations Act when it declared impasse and when it subsequently implemented the proposed wage increase; accordingly, we vacate the Board's order insofar as it found Laurel Bay's implementation of the pay raise constituted an unfair labor practice. In all other respects, the petition is denied and the cross-application for enforcement is granted.[17]

*So ordered.*

---

further bargaining would be fruitful" and that the employers therefore " 'failed to prove that the parties reached impasse.' " *Id.* at 10 (quoting *Wayneview Care Ctr.*, 352 N.L.R.B. 1089, 1089 (2008)). Here, by contrast, when Jasinski declared on August 23 that Laurel Bay's outstanding July 8 offer was its "last and best final offer," the parties had not once come even close to accord on the major sticking point—the contribution rate—nor did Laurel Bay renege on any of the agreed upon terms much less make a regressive offer. The parties' "contemporaneous understanding" was, in short, one of impasse. *See supra* p. 16 note 13.

[17]*See supra* p. 2 note 2.