# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Submitted November 17, 2011          Decided March 9, 2012

No. 10-1400

MONMOUTH CARE CENTER, MILFORD MANOR NURSING AND REHABILITATION CENTER, AND PINEBROOK NURSING HOME, PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD, RESPONDENT

---

Consolidated with 10-1403

---

On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board

---

*David F. Jasinski* was on the briefs for petitioners.

*John H. Ferguson,* Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Robert J. Englehart*, Supervisory Attorney, and *Michael D. Berkheimer*, Attorney, were on the brief for respondent. *Jeffrey J. Barham*, Attorney, entered an appearance.

Before: TATEL and GARLAND, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge.*

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Three related companies that operate New Jersey nursing homes petition for review of a decision of the National Labor Relations Board (NLRB). The Board found that the petitioners violated the National Labor Relations Act by refusing to meet with their employees' union for the purpose of collective bargaining, and by refusing to timely and completely supply information requested by the union. In this court, the petitioners do not dispute that they refused to meet and provide information; instead, they press the affirmative defenses of impasse and bad faith on the part of the union. Because substantial evidence supports the Board's findings that there was no genuine impasse and that the union's information requests were not made in bad faith, we deny the petition for review and grant the Board's cross-application for enforcement.[1]

I

Petitioners Monmouth Care Center, Milford Manor Nursing Home and Rehabilitation Center, and Pinebrook Nursing Home are separate companies that share ownership and management. The companies operate nursing homes and long-term care facilities in New Jersey. SEIU 1199, New Jersey Health Care Union, represents the petitioners' employees, with the exception of registered nurses, supervisors, and other limited categories of personnel. All three employers had separate labor contracts with the union that were due to expire on March 31, 2005, and the

---

[1] This case was considered on the record from the National Labor Relations Board and on the briefs submitted by the parties. *See* FED. R. APP. P. 34(a)(2); D.C. CIR. R. 34(j).

parties began to negotiate successor collective bargaining agreements in early 2005. The employers were represented in negotiations by their counsel, David Jasinski. The union cycled through three chief negotiators during the course of bargaining: Uma Pimplaskar, Justin Foley, and Larry Alcoff.

The issues on the bargaining table included wages, pensions, and health insurance. Another central point of contention was the employers' use of "agency employees" -- employees provided by temporary placement agencies to work in positions that would otherwise have been occupied by members of the bargaining unit. The parties' expiring agreements permitted the employers to staff up to forty percent of their positions with agency employees, provided that those employees were placed in the bargaining unit after working at one of the facilities for a year. In the successor contracts, the union hoped to eliminate or reduce the employers' use of agency employees, while the employers aimed to retain or increase their flexibility to hire and use such employees.

Each employer negotiated separately with the union: Milford bargained three times, Monmouth five times, and Pinebrook seven times. The parties also met for one off-the-record meeting at the union's office in July 2005. Despite making some initial progress in negotiations at each of the three facilities, the employers effectively ceased bargaining with the union by the fall of 2005. Milford presented its so-called "final offer" at its third and final bargaining session with the union on August 19, 2005. Pinebrook made its "final offer" during its fifth bargaining session on September 12, 2005, and then declared impasse during a subsequent session on November 3, 2005. Monmouth never submitted a final offer; instead, bargaining simply concluded after a fifth and final session on August 12, 2005.

Throughout the negotiations, the union repeatedly requested information from the employers, both orally and in writing, regarding a variety of subjects, including their use of agency employees. The union first requested that information in a letter dated January 20, 2005, which asked petitioners to provide, among other things, "[d]ocuments showing the names of agencies used . . . to supply temporary employees working in bargaining unit positions, the amount paid to agencies for temporary employees, . . . and the hourly compensation paid to the agency employees." Letter from Larry Alcoff to David Jasinski (Jan. 20, 2005) (J.A. 858). During later negotiations, the union reiterated its request for that information and advised the employers that the information was needed for bargaining purposes. *See Monmouth Care Ctr.*, 354 N.L.R.B. No. 2, at 12-13, 19, 45-46 (ALJ Op.). The union also sent a number of follow-up letters repeating and supplementing its information requests and objecting to the employers' failure to respond. *E.g.*, Letters from Alcoff to Jasinski (Aug. 30, 2005) (J.A. 1082-85) (requesting a "list of all [agency] employees[,] including name, job title, shift, date of hire . . . , current wage rate, [and] any benefits provided"); Letters from Alcoff to Jasinski (Oct. 10, 2005) (J.A. 1097-99) (repeating the request for "[a]ll items . . . related to the use of Agency personnel"). The employers never provided complete responses to those information requests, particularly those requesting information regarding the use of agency employees. *See* 354 N.L.R.B. No. 2, at 47.

In February and May 2006, the union filed unfair labor practice charges alleging that all three employers had (1) refused to meet and bargain with the union, and (2) refused to timely and completely supply relevant information requested by the union. *See* 29 U.S.C. § 158(a)(5) (making it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees"); *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435-36 (1967) (noting that the duty to

bargain in good faith includes the obligation to provide the employees' representative with information relevant to the collective-bargaining process); *see also Brewers & Maltsters, Local Union No. 6 v. NLRB*, 414 F.3d 36, 45-46 (D.C. Cir. 2005) (noting that an employer "violates the Act not only by refusing to provide . . . relevant information but also by not providing it in a timely manner"). The employers defended on the ground that their refusals were lawful because the parties were at impasse and because the union had requested the information in bad faith.

After a hearing, an administrative law judge (ALJ) ruled in favor of the union on both charges. On April 27, 2009, a two-member panel of the Board affirmed the ALJ's decision. *Monmouth Care Ctr.*, 354 N.L.R.B. No. 2 (Board Op. I). After the Supreme Court held in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), that two-member panels do not have the authority to decide cases under the NLRA, a three-member panel adopted and incorporated the earlier Board decision by reference. The Board's final decision and order issued on November 17, 2010. *Monmouth Care Ctr.*, 356 N.L.R.B. No. 29 (Board Op. II).

II

The employers did not object before the Board to the ALJ's findings that they refused to meet and bargain with the union, and that they refused to provide relevant information to the union in a complete and timely fashion. 354 N.L.R.B. No. 2, at 1 n.2 (Board. Op. I). Nor do they seriously contest those findings here, which is appropriate because, except in extraordinary circumstances, the failure to urge an objection before the Board bars review of that objection in this court. *See* 29 U.S.C. § 160(e); *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982). Instead, the employers argued to the Board, and continue to argue here, "only that the [ALJ] erred by

rejecting their affirmative defenses" of impasse and bad faith on the part of the union.  354 N.L.R.B. No. 2, at 1 n.2.

In subpart A, we address the employers' contention that a genuine bargaining impasse relieved them of their duty to meet and bargain.  In subpart B, we address their claim that they had no obligation to respond to the union's information requests because the union made those requests in bad faith.

A

A genuine bargaining impasse temporarily suspends an employer's duty to meet and bargain with a union.  *See Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 232 (D.C. Cir. 1996); *Richmond Elec. Servs.*, 348 N.L.R.B. 1001, 1003-04 (2006).  Such an impasse is reached when "good-faith negotiations have exhausted the prospects of concluding an agreement," *Taft Broad. Co.*, 163 N.L.R.B. 475, 478 (1967), and "there [is] no realistic possibility that continuation of discussion . . . [would be] fruitful," *Am. Fed'n of Television & Radio Artists v. NLRB*, 395 F.2d 622, 628 (D.C. Cir. 1968).  The Board considers a number of factors to determine whether the parties have reached impasse, including "[t]he bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations."  *Taft Broad.*, 163 N.L.R.B. at 478.  The burden of proving the affirmative defense of impasse lies with the party asserting it.  *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 347 (D.C. Cir. 2011); *Sage Dev. Co.*, 301 N.L.R.B. 1173, 1189 & n.37 (1991).

We have recently reiterated the limited role this court plays in reviewing an NLRB decision, particularly a decision regarding the existence of impasse:

"We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Mohave Elec. Coop., Inc. v. NLRB*, 206 F.3d 1183, 1188 (D.C. Cir. 2000) (internal quotation marks and citation omitted). Of particular relevance here -- because the existence of impasse is a question of fact -- is the statutory admonition that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). Moreover, as we have previously noted, "'in the whole complex of industrial relations[,] few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems.'" *TruServ* [*Corp. v. NLRB*], 254 F.3d [1105,] 1115 [(D.C. Cir. 2001)] (quoting *Am. Fed'n*, 395 F.2d at 627). Accordingly, this "court ordinarily defers to the Board's fact-finding as to the existence of a bargaining impasse," *id.* at 1115, "unless the finding is irrational or unsupported by substantial evidence," *Teamsters Local Union No. 175 v. NLRB*, 788 F.2d 27, 30 (D.C. Cir. 1986).

*Wayneview*, 664 F.3d at 348. Applying this standard, we conclude that substantial evidence supports the Board's determination that the employers fell "far short of meeting their burden of establishing the existence of an impasse at any of the three facilities." 354 N.L.R.B. No. 2, at 47 (ALJ Op.); *see* 356 N.L.R.B. No. 29, at 1 (Board Op. II).

1. Because the employers refused to bargain jointly despite the union's repeated requests, *see, e.g.*, 354 N.L.R.B. No. 2, at

12 (ALJ Op.), we begin by addressing the negotiations between the union and each employer separately.

At Monmouth, the parties conducted only five negotiating sessions, with the final session lasting no longer than an hour. At the time Monmouth ceased negotiating, it had not yet submitted its own economic proposal despite having promised to do so, and very little bargaining had taken place regarding the union's latest economic proposal, which the union had submitted during the penultimate negotiation session on July 8, 2005. 354 N.L.R.B. No. 2, at 47-48; *see* Hr'g Tr. 40-41 (Oct. 23, 2007) (J.A. 81-82) (testimony of Foley); Hr'g Tr. 261-63 (Oct. 24, 2007) (J.A. 124-25) (testimony of Alcoff). Moreover, the union's July 8 proposal demonstrated a clear willingness to compromise by showing movement on economic matters and on the critical issue of the use of agency employees.[2] Perhaps most significant, Monmouth never made a final offer or declared impasse during negotiations, and its representatives never made any contemporaneous assertion that they considered the parties to be deadlocked. Under these circumstances, the NLRB was warranted in rejecting Monmouth's claim of impasse as "totally without merit." 354 N.L.R.B. No. 2, at 47 (ALJ Op.); *see NLRB v. Powell Elec. Mfg. Co.*, 906 F.2d 1007, 1012-13 (5th Cir. 1990) (finding no impasse where "little substantive bargaining

---

[2]For example, the union's prior proposal, submitted in May 2005, had asked for pension fund contributions of 2.5 percent of earnings for each bargaining unit employee. The July 8 proposal scaled back that request by asking for contributions of 2 percent effective July 15, 2005, and up to 2.5 percent on March 1, 2008. *Compare* Initial Proposals for Monmouth Care 2005 Contract Negotiations at 9 (May 11, 2005) (J.A. 868) *with* Monmouth Care Economic Outline (July 8, 2005) (J.A. 872). The union also modified its proposal regarding agency employees by eliminating the requirement in its May proposal that agency employees be made permanent and included in the bargaining unit after working on a regular basis for ninety days. *See* 354 N.L.R.B. No. 2, at 48 (ALJ Op.).

had taken place" during the parties' few negotiation sessions and the union had made proposals that "obviously were grist for the collective bargaining mill"); *Essex Valley Visiting Nurses Ass'n*, 343 N.L.R.B. 817, 841 (2004) (finding the absence of impasse where "neither party stated that the parties had reached impasse at the close of the meeting").

At Milford, the parties bargained only three times before the employer submitted its so-called "final offer." That proposal was in fact Milford's *first* offer, and no substantive negotiations had taken place regarding that offer before Milford's representative characterized it as "final." 354 N.L.R.B. No. 2, at 48 (ALJ Op.); *see* H'rg Tr. 253-54 (Oct. 24, 2007) (J.A. 122) (testimony of Alcoff). Nor is there evidence of any contemporaneous understanding that the parties were at genuine impasse; indeed, at the conclusion of the third and final bargaining session on August 19, 2005, Milford's negotiator "did not object to or dispute the need for more meetings," but merely stated that he did not have his calendar with him and would have to contact the union's representative to schedule another session. 354 N.L.R.B. No. 2, at 48. Although the union requested additional meetings, Milford never responded to schedule them. *Id.* at 53. Moreover, at the third and final session, the union submitted a modified proposal that, like the proposal at Monmouth, demonstrated movement in several key areas of disagreement, including the use of agency employees. *See* Proposal Submitted by SEIU (J.A. 970-71). Taken together, this evidence amply supports the Board's finding that there was no genuine impasse at Milford. *See Cotter & Co.*, 331 N.L.R.B. 787, 787-88 (2000) (rejecting a defense of impasse where the employer "abruptly claimed that its 'last, best and final offer' was on the table," despite the fact that "the Union had demonstrated considerable flexibility and willingness to compromise" and "the parties did not have a contemporaneous understanding that they were at impasse").

At the third facility, Pinebrook, the parties bargained five times before the employer submitted its "final offer" on September 12, 2005; an additional time on November 3, 2005 during which the employer formally declared impasse; and one final time over a year later, on January 24, 2007. Despite these seven sessions, bargaining had only begun in earnest when Pinebrook declared impasse. *See* 354 N.L.R.B. No. 2, at 49 (ALJ Op.). Moreover, as at Milford, the union had made several significant concessions in its proposals that demonstrated flexibility in its bargaining positions. In particular, the union showed a willingness to compromise on the key issue of agency employees: although its initial proposal had been to immediately eliminate the use of all such employees except where necessary to "fill[] in for absent bargaining unit employees" or "to meet temporary staffing needs," Initial Proposals for Pinebrook 2005 Contract Negotiations at 11 (J.A. 926), its subsequent proposals modified that position to permit Pinebrook to continue using up to forty percent agency employees for the first year of the contract, with a gradual reduction in that percentage over the remaining years, *see* Proposal Submitted by SEIU (J.A. 970-71). Indeed, on November 3, 2005, the union suggested that the parties operate under the status quo, including the forty percent agency employee cap, during a probationary period while continuing to bargain toward a final agreement. 354 N.L.R.B. No. 2, at 20; Hr'g Tr. 324-25 (Oct. 24, 2007) (J.A. 138) (testimony of Alcoff). This demonstrated flexibility, coupled with the relatively short bargaining timeline, provides substantial evidence for the Board's determination that -- as at Monmouth and Milford -- there was no genuine impasse at Pinebrook.

2. The employers argue that, appearances aside, the union bargained in bad faith with all three of them by rigidly adhering to certain fixed demands. This, they maintain, supports the proposition that the parties were at impasse. Pet'r Br. 40 (citing *Taft Broad.*, 163 N.L.R.B. at 478); *see also Indus. Elec. Reels,*

*Inc.*, 310 N.L.R.B. 1069, 1071-72 (1993) (holding that "entering negotiations with a predetermined resolve not to budge from an initial position betrays an attitude inconsistent with good-faith bargaining" (internal quotation marks omitted)). But the Board's rejection of this claim is well supported by the record. Although the employers stress and the ALJ assumed without deciding that the union's original negotiator, Uma Pimplaskar, initially characterized certain bargaining items as "non-negotiable," 354 N.L.R.B. No. 2, at 51,[3] the ALJ reasonably concluded that any such statements were cured by later negotiations in which the union's successor representatives demonstrated a willingness to compromise on precisely those issues, *see id.* at 52 (finding that "with respect to the two areas that Pimplaskar had allegedly stated were nonnegotiable, benefit contributions and agency usage, the Union made modifications in their proposals").

The employers' assertion that the union refused to vary from the terms of a prior agreement known as the "Tuchman Agreement" is likewise unpersuasive. The Tuchman Agreement was a contract containing a "most-favored-nations" clause that the union had recently negotiated with other nursing home employers. The petitioners contend that the union "insist[ed]" in its negotiations with each of the three facilities "that it could not and would not deviate" from the Tuchman Agreement's terms, and that this rigid bargaining position led to an overall impasse. Pet'r Br. 40. But the Board affirmed the ALJ's findings that the union never invoked the most-favored-nations clause as a barrier to reaching a different bargain with the

---

[3]The ALJ said: "[W]hile I do find it unlikely that Pimplaskar would make such statements, it is not impossible, particularly in view of the evidence in the record of her inexperience as a negotiator. Therefore, for the purposes of this decision, I shall assume without deciding that Pimplaskar made the comments attributed to her by" the employers' negotiators. 354 N.L.R.B. No. 2, at 51.

petitioners, and that it never stated it was bound by the Tuchman Agreement's specific terms. *See* 356 N.L.R.B. No. 29, at 1 (Board Op. II); 354 N.L.R.B. No. 2, at 52 (ALJ Op.). In particular, the ALJ credited the testimony of the union's negotiator over that of the petitioners' representatives on this issue, based on a combination of testimonial demeanor and a lack of specificity and internal corroboration for the petitioners' claims. 354 N.L.R.B. No. 2, at 50. The petitioners do not challenge those credibility determinations, and we find no basis for overturning them under the highly deferential standard that we must apply. *See United Food & Commercial Workers Union Local 204 v. NLRB*, 447 F.3d 821, 824 (D.C. Cir. 2006) ("'[W]e do not reverse the Board's adoption of an ALJ's credibility determinations unless . . . those determinations are hopelessly incredible, self-contradictory, or patently unsupportable.'" (quoting *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 28 (D.C. Cir. 1998))).

Moreover, the evidence shows that the union's proposals deviated from the terms of the Tuchman Agreement in some significant respects. The ALJ noted "several differences between the union's proposal and the Tuchman Agreement[,] including provisions regarding parity increases, shift differential, and time-and-half for [licensed practical nurses] working two floors." 354 N.L.R.B. No. 2, at 17-18. The ALJ further noted that, "while there are some similarities in the proposals of the Union and [the] Tuchman Agreement," the contract terms varied in other important ways as well, "particularly in the crucial agency usage provisions, as well as in the effective date of the Health Plan contributions." *Id.* at 53. *Compare* Tuchman Master Agreement at 18 (J.A. 743), *with* Proposal Submitted by SEIU at 1-2 (J.A. 970-71). As such, substantial evidence supports the Board's finding that the Tuchman Agreement was not an impediment to further bargaining.

3. Our recent decision in *Laurel Bay Health & Rehabilitation Center v. NLRB*, -- F.3d --, 2012 WL 164051 (D.C. Cir. Jan. 20, 2012), does not undermine the Board's finding that there was no impasse or bad faith bargaining here. In a post-argument letter, the petitioners call attention to our conclusion in that case that "the Board erred in upholding the ALJ's finding that the parties were not at impasse" at the time the employer presented its "last and best final offer." *Laurel Bay*, 2012 WL 164051, at *6. But *Laurel Bay* is not this case. To be sure, it involved similar legal issues, the same union, some of the same negotiators on each side of the table, and similar arguments about the role the Tuchman Agreement played during negotiations. But it also involved a different employer, facility, and course of negotiations. At the time the employer declared impasse at Laurel Bay, for example, "the parties remained steadfastly fixed in their respective positions," with "neither party [having] budged" on the critical terms of its proposals, and with "the Union adhering to the Tuchman agreement terms." *Id.* at *6-7. Indeed, "after six months of negotiation[,] the parties . . . remained as far apart . . . as they were when talks began," *id.* at *7, and they "had not once come even close to accord on the major sticking point" in their negotiations: the amount of Laurel Bay's contributions to the employees' health insurance plan, *id.* at *8 n.16. Here, by contrast, substantial evidence supports the Board's findings that the union did not rigidly adhere to the Tuchman Agreement, that it made significant concessions in the key areas of disagreement, and that the employers abruptly cut off bargaining at each facility before further negotiations could occur.

As both the Board and this court have repeatedly emphasized, determining whether impasse or bad faith bargaining occurred involves multiple, highly fact-dependent

considerations.[4]  Indeed, the petitioners stressed precisely that point in fending off the NLRB's own post-argument letter, which called our attention to another recent decision of this court, *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341 (D.C. Cir. 2011).  In that case -- which also involved similar legal issues, the same union, some of the same negotiators, and the Tuchman Agreement, but yet a different employer and facility -- we affirmed a no-impasse finding by the Board.  *See id.* at 348; *see also id.* at 349 (affirming the Board's finding that "the 'most-favored-nations clause [of the Tuchman Agreement] was not a bar to further movement'" in that case).  As the petitioners rightly emphasized in their response to the NLRB's letter, the facts of each case must be evaluated on their own, and the court must "base its decision on the record and briefs submitted by the parties" in the case before it.  Pet'r Letter Opposing NLRB's Rule 28(j) Letter at 2 (filed Jan. 6, 2012).

4.  Finally, the NLRB's finding that Monmouth, Milford, and Pinebrook all failed to provide the union with relevant information concerning the critical bargaining issue of agency employees provides still further support for its determination that there was no genuine impasse at any of the three facilities.  *See* 354 N.L.R.B. No. 2, at 48-49 (ALJ Op.); 356 N.L.R.B. No. 29, at 1 (Board Op. II).  As this court has recognized, the duty to provide information relevant to bargaining is a "fundamental obligation" that is crucial to the proper functioning of the collective bargaining process.  *Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*, 711 F.2d 348, 358 (D.C. Cir.

---

[4]*See United Steelworkers of Am. Local 14534 v. NLRB*, 983 F.2d 240, 245-46 (D.C. Cir. 1993); *Teamsters Local Union No. 175*, 788 F.2d at 30 & n.7; *Dallas Gen. Drivers Local 745 v. NLRB*, 355 F.2d 842, 844-45 (D.C. Cir. 1966); *AMF Bowling Co.*, 314 N.L.R.B. 969, 973 (1994), *enforcement denied on other grounds*, 63 F.3d 1293 (4th Cir. 1995); *Dust-Tex Serv., Inc.*, 214 N.L.R.B. 398 (1974), *enf'd*, 521 F.2d 1404 (8th Cir. 1975); *Taft Broad.*, 163 N.L.R.B. at 478.

1983). Accordingly, "'impasse cannot exist where the employer has failed to satisfy its statutory obligation to provide information needed by the bargaining agent to engage in meaningful negotiations.'" *E.I. Du Pont de Nemours & Co. v. NLRB*, 489 F.3d 1310, 1315 (D.C. Cir. 2007) (quoting *Decker Coal Co.*, 301 N.L.R.B. 729, 740 (1991)).

In this case, the union repeatedly requested information from each employer regarding a number of relevant topics, including the employer's use of agency employees. None of the facilities provided timely and complete responses to those inquiries. *See* 354 N.L.R.B. No. 2, at 47 (ALJ Op.) (finding that "a large amount of information, particularly with respect to agency usage," was not "produced at all" or "was incomplete"). It was therefore reasonable for the Board to conclude that the petitioners' failure to provide information concerning a central point of contention between the parties -- indeed, regarding an issue that the petitioners themselves characterize as a "key bargaining issue," Pet'r Br. 36, 39 -- frustrated the parties' efforts to reach an agreement and precluded a finding of genuine impasse. *See* 354 N.L.R.B. No. 2, at 49 (finding that the union's representative specifically stated during the Pinebrook negotiations that the union was "'trying to show movement,' but needed the information requested on agency usage, which had not been provided, in order to do so"); *see also E.I. Du Pont de Nemours*, 489 F.3d at 1315.

5. In sum, because substantial evidence supports the Board's rejection of the employers' affirmative defense of impasse, there is no ground for overturning the Board's conclusion that the employers violated their statutory duty to meet and bargain with the union.

B

In addition to supporting the Board's conclusion that no genuine impasse existed at any of the three facilities, the employers' failure to respond to the union's information requests also formed the basis for the Board's finding of a separate violation of the National Labor Relations Act. An employer charged with failing to provide requested information may argue as an affirmative defense that the request was made in bad faith, *see, e.g.*, *NLRB v. Hawkins Constr. Co.*, 857 F.2d 1224, 1227 & n.3 (8th Cir. 1988), and the petitioners did so here. But the employer bears the burden of persuasion on that defense, *id.*, and substantial evidence on the record supports the NLRB's determination that the petitioners failed to satisfy that burden.

The petitioners' principal contention is that the union acted in bad faith by "making irrelevant information requests prior to and after the declaration of impasse in a deliberate attempt to try to stave off impasse." Pet'r Br. 40. The Board, however, affirmed the ALJ's finding that the requested information was in fact relevant to bargaining. *See* 354 N.L.R.B. No. 2, at 1 (Board Op. I); 354 N.L.R.B. No. 2, at 45-46 (ALJ Op.). In so doing, the Board noted that the employers had failed to file any exceptions to the ALJ's finding on that point. 354 N.L.R.B. No. 2, at 1 n.2 (Board Op. I). The employers' waiver of their relevance argument before the Board deprives this court of authority to consider the issue. See 29 U.S.C. § 160(e); *Woelke & Romero Framing*, 456 U.S. at 665.

The petitioners also assert that the union "failed to raise any objections to Petitioners' response to its initial information requests and did not make any new information requests until after Petitioners had declared that the parties were at impasse." Pet'r Br. 44. Although this argument does not appear to have been waived, it is flatly contradicted by the record evidence.

That evidence shows that the union requested information concerning the use of agency employees, among other things, as early as January 20, 2005, before bargaining even began. Letter from Alcoff to Jasinski (Jan. 20, 2005) (J.A. 856-58). The union reiterated its information requests throughout 2005, sending numerous follow-up letters and frequently opening its negotiation sessions by objecting to the employers' failure to provide the information in a complete and timely fashion. *See, e.g.*, 354 N.L.R.B. No. 2, at 11-13, 16, 43-45 (ALJ Op.); Hr'g Tr. 66 (Oct. 23, 2007) (J.A. 88) (testimony of Foley); Hr'g Tr. 290-91 (Oct. 24, 2007) (J.A. 131-32) (testimony of Alcoff). Indeed, the union repeatedly informed the employers, both orally and in writing, that responses to the outstanding information requests were necessary to develop its bargaining positions, and that significant compromises would be difficult until that information was received.[5] Finally, although the union did agree to engage in several bargaining sessions in mid- to late 2005 without receiving the requested information, the ALJ credited a union representative's assertion that the lack of complete information regarding the critical issue of agency employees hampered the union's ability to show further movement and put forth counter-proposals. 354 N.L.R.B. No. 2, at 49; *see* Hr'g Tr. 294 (Oct. 24, 2007) (J.A. 132) (testimony of Alcoff). Accordingly, substantial evidence supports the NLRB's determination that the petitioners failed to satisfy their burden of showing that the union requested information in bad faith.

---

[5]For example, in a letter dated September 12, 2005, the union reiterated its information requests, stated that it could "only make modest changes . . . until we receive the remaining information," and averred that "[u]pon receipt of the information, the Union is prepared to modify its proposal." Letter from Alcoff to Jasinski (Sept. 12, 2005) (J.A. 1093).

18

III

For the foregoing reasons, we deny the petition for review and grant the Board's cross-application for enforcement.

*So ordered.*