# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Submitted December 6, 2011          Decided June 29, 2012

No. 10-1352

ATRIUM OF PRINCETON, LLC, PAVILIONS AT FORRESTAL,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 10-1408

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*David F. Jasinski* was on the briefs for petitioner.

*John H. Ferguson*, Associate General Counsel, National Labor Relations Board, *Linda Dreeben*, Deputy Associate General Counsel, *Robert J. Englehart*, Supervisory Attorney, and *Steven B. Goldstein*, Attorney were on the brief for respondent.

Before: HENDERSON, *Circuit Judge*, and WILLIAMS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: Atrium at Princeton owns and operates the nursing home Pavilions at Forrestal. The National Labor Relations Board held Atrium committed various unfair labor practices in connection with its negotiations for a new collective bargaining agreement (CBA) with SEIU 1199 New Jersey Health Care Union. The Board concluded Atrium did not bargain in good faith with the Union because the parties were not at an impasse when Atrium refused to bargain any further. We deny the Employer's petition for review and grant the Board's cross-application for enforcement.

## I. Background

This is the last in a tetralogy[*] of related cases to come before the court this term. Each case began with the Union filing an unfair labor practice charge (refusal to bargain) against a nursing home in New Jersey, and in each case the employer defended itself on the ground that the parties had reached an impasse in bargaining. Larry Alcoff was the Union's chief negotiator in all four cases and David Jasinski was the chief negotiator for the employer in three of the four, including this one. Jasinski has also served as appellate counsel for the nursing home petitioners in each of the four cases.

---

[*] In Attic drama, a tetralogy was a series of four related plays — three tragedies followed by a satyr-play. Like other modern variants, such as Shakespeare's *Henriad*, the present tetralogy does not fit neatly into the classical taxonomy.

In each case the employer has argued the Union failed to bargain in good faith because it patterned its bargaining proposals in important respects after an agreement that had been the basis for nearly identical CBAs the Union had previously signed with some 20 other nursing homes in New Jersey and it would not move meaningfully off the terms of that agreement. The nursing homes all argued that, because the pattern agreement contained a "most-favored nation" clause, the Union directed its bargaining representatives not to deviate from the terms of that agreement in making proposals to other nursing homes in New Jersey. Accordingly, each employer claimed it was justified in declaring an impasse, refusing to bargain further with the Union, and implementing its last, best offer.

In *Wayneview Care Center v. NLRB*, 664 F.3d 341, 348–50 (D.C. Cir. 2011), and *Monmouth Care Center v. NLRB*, 672 F.3d 1085, 1091–92 (D.C. Cir. 2012), we held substantial evidence supported the Board's finding the parties had not reached an impasse in bargaining because in each case the Union had made substantial concessions departing from its initial bargaining position based upon the pattern agreement. In *Laurel Bay Health & Rehabilitation Center v. NLRB*, 666 F.3d 1365, 1376–77 (D.C. Cir. 2012), by contrast, we held the Union's professions of flexibility did not preclude the employer's declaring an impasse because the objective evidence showed the Union maintained a fixed bargaining position tied to the pattern agreement. In the present case, the dispute turns not upon whether the parties reached an impasse but upon whether later events broke any impasse they may have reached.

Atrium's predecessor in ownership of the nursing home met and bargained with the Union on numerous occasions in 2005. By mid-year the parties had reached or neared

agreement on many subjects but were essentially deadlocked over the rate at which the Employer would contribute to the Greater New York Benefit Fund, an employee benefit fund (EBF) that provided health benefits to the employees. Under their prior CBA, the nursing home had contributed to the Fund at the rate of about 13 percent of its gross payroll but the Union proposed that the Employer increase the rate to 22.33 percent, as provided in the pattern agreement. The Employer proposed keeping its contribution at roughly the rate it had paid under the prior agreement. In August the Employer made what it claimed was its "final, last and best offer," which included an increase in the proposed contribution to a rate of 16 percent of its gross payroll. The Union, however, continued to insist upon 22.33 percent.

After that meeting, Jasinski declared the parties were at an impasse and the Employer was therefore relieved of any further obligation to meet and to bargain with the Union. Subsequent events, however, complicated the situation. In December 2005, Atrium at Princeton bought the nursing home and retained Jasinski as the Employer's chief negotiator. Around that time the Union discovered the Fund had cancelled the employees' health benefits on December 1 because Atrium's predecessor had been delinquent in its in payments. In January 2006, the Union also learned Atrium had implemented a replacement health care plan for its employees without informing the Union. Alcoff then asked for information about the new health plan and proposed to meet with the Employer on any of several specific dates. Jasinski did not respond to the Union's request for information and refused all but one of Alcoff's numerous requests for meetings on the ground the Union's bargaining position was "unyielding" and the parties were at an impasse. (The two men did schedule one meeting in 2006, but Alcoff cancelled it because he was busy with an internal Union

election, and Jasinski refused to agree to any additional meeting.)

The Union filed charges with the Board alleging Atrium and its predecessor had committed various unfair labor practices, and in December 2006 the Board's General Counsel filed a complaint against both Atrium and its predecessor. An Administrative Law Judge held a hearing and concluded both Atrium and its predecessor had violated the National Labor Relations Act, in Atrium's case by refusing to meet and to bargain with the Union, refusing to comply with the Union's requests for information relevant to bargaining, and making various unilateral changes to the terms and conditions of employment, including implementing a new health plan. The ALJ rejected Atrium's defense that the Fund had acted as the Union's agent in cancelling the employees' health plan, thereby allegedly justifying the Employer's unilateral implementation of a replacement plan. The ALJ also rejected Atrium's defense that the parties had reached an impasse in bargaining. Although he found "all the elements of a genuine impasse in bargaining were in place" as of December 2005, *Atrium at Princeton, LLC*, 353 N.L.R.B. 540, 561 (2008) (ALJ Op.), he held the Employer's failure to comply with the Union's requests for relevant information precluded its declaring an impasse.

The Board affirmed the ALJ's decision but found it "unnecessary to decide whether the parties had reached a genuine impasse in their negotiations" because the Fund's "cancellation of the existing health insurance plan and the necessity of [the Employer's] obtaining alternate coverage changed the backdrop of negotiations and created the possibility of productive bargaining," thereby breaking any impasse that may have existed. *Id.* at 541 (Board Op.). Had Atrium given the Union "notice and an opportunity to bargain

prior to implementing the new health insurance plan and/or" responded to related information requests, "it may have led to informed bargaining and an earlier offer by the Union to consider alternate plans." *Id.* Therefore, an "impasse, if any, no longer existed on January 19, 2006, when the Union requested information and demanded bargaining concerning the new plan." *Id.*[*]

## II. Analysis

Atrium petitions for review of the Board's order holding it violated §§ 8(a)(1) and (5) of the NLRA, 29 U.S.C. §§ 158(a)(1) & (5). Rather than seriously contesting the factual underpinnings for the prima facie case against it, however, the Employer primarily relies upon two affirmative legal defenses. First, it contends the Union caused the Fund to cancel the health plan in order to force the Employer to accede to the Union's bargaining demands, thereby justifying the Employer's unilaterally implementing a replacement healthcare plan. Second, it argues the Board erred in finding any impasse in bargaining had been broken, and the continuing impasse relieved it of the duty to bargain with the Union and to provide the Union with information regarding the new healthcare plan.

---

[*] After the Supreme Court held a decision by a two-member panel of the Board is invalid, *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), we vacated the Board's order and remanded this case for further proceedings before a lawfully constituted panel, *Atrium at Princeton, LLC v. NLRB*, Nos. 08‑1399 & 09‑1043, 2010 WL 6428501 (D.C. Cir. Sept. 20, 2010). A three-member panel of the Board then issued a new decision, substantially incorporating the decision previously adopted by the two members. *Atrium at Princeton*, 356 N.L.R.B. No. 6, 2010 WL 4318370 (Oct. 22, 2010).

**A. Was the Fund acting as the Union's agent?**

The Employer contends the Board lacked substantial evidence for its conclusion the Union was not responsible for the Fund's cancellation of the Employer's health benefits plan because the Union dominated the Fund and caused the Fund to cancel the employees' health benefits in the hope of forcing the Employer to accept the Union's bargaining demands. The Board responds the Employer provided insufficient evidence to show the Fund acted as the Union's agent.

The NLRA does not provide much guidance on the application of agency law. Section 2(13) of the NLRA simply provides: "In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 152(13). This provision incorporates into the NLRA the "ordinary common law rules of agency." *Int'l Longshoremen's Ass'n, AFL-CIO v. NLRB*, 56 F.3d 205, 212 (D.C. Cir. 1995) (internal quotation marks and citation omitted). Because the Congress "did not delegate to the Board the power to interpret [this] section," *Overnite Transp. Co. v. NLRB*, 140 F.3d 259, 265 (D.C. Cir. 1998), we do not defer to the Board's application of agency principles, though we would give "due weight to the Board's judgment to the extent that it made a choice between two fairly conflicting views," *Int'l Longshoremen's Ass'n*, 56 F.3d at 212 (internal quotation marks and citation omitted). And, of course, to the extent "an agency relationship is a factual matter," we must uphold the Board's finding if it is supported by substantial evidence on the record considered as a whole. *Garvey Marine, Inc. v. NLRB*, 245 F.3d 819, 824 (D.C. Cir. 2001) (internal quotation marks and citation omitted).

Ordinarily "an agency relationship arises only where the principal 'has the right to control the conduct of the agent with respect to matters entrusted to [the agent],'" *Int'l Longshoremen's Ass'n*, 56 F.3d at 213 (quoting RESTATEMENT (SECOND) OF AGENCY § 14 (1958)). The same rule applies when determining whether a trustee is an agent. RESTATEMENT (THIRD) OF AGENCY § 1.04(10) (2006) (denominating "a trustee subject to the control of the settlor or of one or more beneficiaries" an "agent-trustee"). Moreover, "[t]he party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence"). RESTATEMENT (THIRD) OF AGENCY § 1.02 cmt. d (2006). In applying these principles we must, however, be "sensitiv[e] to the particular circumstances of industrial labor relations." *Local 1814, Int'l Longshoremen's Ass'n v. NLRB*, 735 F.2d 1384, 1394 (D.C. Cir. 1984). No case in this Circuit has considered whether an EBF acted as an agent either of an employer or of a union.

In rejecting Atrium's defense that the Fund acted as the Union's agent, the ALJ distinguished *Service Employees Local 1-J*, *see* 353 N.L.R.B. at 563 (citing 273 N.L.R.B. 929 (1984)), in which the Board said it would attribute to the union an act of the trustees of an EBF if that act was "directed by union officials" or "undertaken in their capacities as union officials rather than as trustees," or if the CBA limited the trustees' "discretion to administer the funds solely for the benefit of the employees," 273 N.L.R.B. at 931 (incorporating standard from *Griffith Co. v. NLRB,* 660 F.2d 406, 410 (9th Cir. 1981)). To the extent that case held a finding of control was a sufficient condition to establish an agency relationship between a union and an EBF, however, it is in tension with the Supreme Court's decision in *NLRB v. Amax Coal Co.*, 453 U.S. 322, 334 (1981): "[A]n employee benefit fund trustee is

a fiduciary whose duty to the trust beneficiaries must overcome any loyalty to the interest of the party that appointed him." As the Second Circuit reads this case, and we agree, EBF "trustees acting within their authority cannot, as a matter of law, be considered union agents"; the trustees are agents of the union only if they are "violating their fiduciary duty as Fund trustees, and doing so to further the collective bargaining aims of the Union." *NLRB v. Local 449, Int'l Bhd. of Teamsters*, 728 F.2d 80, 87 (2d Cir. 1984); *cf. also Hearn v. McKay*, 603 F.3d 897, 902 (11th Cir. 2010) ("The Supreme Court has been explicit about the undivided nature of an ERISA trustee's role and duties"); *NLRB v. Constr. & Gen. Laborers' Union Local 1140*, 887 F.2d 868, 871 (8th Cir. 1989) ("*Amax Coal* relieves [respondent] of any obligation as a Fund Trustee to the Union that appointed him"); *NLRB v. Driver Salesmen Local 582*, 670 F.2d 855, 858 (9th Cir. 1982) ("[T]rustees ... [must] be independent [both] of the union [and of] the employer"). *But see Griffith Co.,* 660 F.2d at 410–11 (attributing act of trustees to union based upon either factual or legal control over trust without considering whether trustees violated fiduciary duty to beneficiaries).

Taken together, these cases suggest a two-step analysis: In order to show an EBF acted as an agent of the union, the employer (or the Board, as the case may be) must establish: (1) the union exercised control over the fund, and (2) the trustees of the fund served the interests of the union in breach of their fiduciary duty to the employee beneficiaries. The proponent may prove control either generally or with regard to a specific material act. Control may arise from the union pressuring the employer-nominated trustees, *see Teamsters*, 728 F.2d at 88, or out of a contract, for example, where the CBA denies the trustees "the discretion to administer the

funds solely for the benefit of the employees," *Griffith*, 660 F.2d at 410.

Applying this test, we conclude the Board did not err in finding the Fund was not, as Atrium contends, an agent of the Union when it cancelled the employees' health benefits; the evidence the Employer offers is not nearly sufficient to meet its burden at either step in the analysis. As to control, Atrium first points to what it says is the undisputed testimony of its chief negotiator and appellate counsel that there were more union trustees than employer trustees of the Fund. In fact, however, his testimony was directly contradicted by that of Odette Machado, a former official of the Union, as well as by the ALJ's finding "[o]ne half of trustees are designated by the Employers and one half are designated by the Union," 353 N.L.R.B. at 556; *see also Laurel Bay*, 666 F.3d at 1368 n.3.

The other evidence Atrium offers fails even to suggest the Union controlled the Fund. For example, that none of the employer-nominated trustees was nominated by an employer located in New Jersey speaks not at all to the Union's control of the Fund. That the president of the Union is also a trustee of the Fund is neither surprising nor troubling in a system where the unions that establish a fund and the employers that contribute to it each pick half the trustees. *See Atrium at Princeton,* 353 N.L.R.B. at 556. Finally, that several employees of the Fund worked for a time in the offices of the Union hardly evidences the Union's control of the Fund because, as the ALJ found, the Fund was then merely renting office space from the Union. *Id.* at 562.

As to the interest the Fund served, there is likewise little evidence to suggest the Fund pursued the Union's interests rather than those of the employee beneficiaries. The Union's direction to its staff to contact Atrium whenever it was behind

in its payments to the Fund may show the Union and the Fund had a common interest in employers keeping their employees' benefits fully funded, but there is no legal significance to such a confluence of interests so long as the Fund does not disserve the interests of the beneficiaries. The Employer also argues the Fund was acting for the Union because the Fund cancelled the employees' health benefits even though its predecessor had liquidated all of its delinquency by making a payment of $240,100 in September 2005. The ALJ, however, found, and the Employer conceded, it was $350,000 in arrears at the time of that payment, 353 N.L.R.B. at 549–50; so far as the record shows, therefore, the Employer was still $109,900 behind in its payments when the Fund cancelled the employees' health benefits. In short, the Fund had a legitimate reason to cancel the benefits and, in any event, the Employer has not proven the Union caused the cancellation.

## B. Did the lapse in health coverage break any impasse?

Atrium maintains the parties had reached an impasse that persisted throughout the period during which it refused to bargain with the Union. Therefore, it suggests the Board erred in concluding Atrium violated the NLRA by refusing to meet and to bargain with the Union, by refusing to provide the Union with relevant information, and by making various changes to the terms and conditions of employment.

The parties to an expired collective bargaining agreement have a duty to bargain in good faith for a new agreement but they are not required to reach an agreement; "when good faith negotiations have exhausted the prospects of concluding an agreement," the parties have reached an impasse, *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1114 (D.C. Cir. 2001) (internal quotation marks and citation omitted), which "temporarily suspends the duty to bargain," *Serramonte*

*Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 232 (D.C. Cir. 1996). An impasse therefore relieves "the employer[] [of its] statutory duty to maintain the status quo during postcontract negotiations .... The employer then may make unilateral changes that are reasonably comprehended within [its] preimpasse proposals." *Mail Contractors of America v. NLRB*, 514 F.3d 27, 31–32 (D.C. Cir. 2008) (internal quotation marks, citations, and alteration omitted).

An impasse lasts until there are "changed circumstances sufficient to suggest that future bargaining would be fruitful." *Serramonte,* 86 F.3d at 233 (emphasis omitted). The changed circumstance may be brought about by a party's change of mind, *Charles D. Bonanno Linen Service, Inc. v. NLRB*, 454 U.S. 404, 412 (1982), by the application of economic force, such as a strike or the employer's unilateral implementation of its final offer, *see id.*; *Mail Contractors of America*, 514 F.3d at 31–32, or by any other event that "alter[s] the economic calculus of one of the sides," *NLRB v. McClatchy Newspapers, Inc.*, 964 F.2d 1153, 1173 (D.C. Cir. 1992) (Edwards, J., concurring).

Atrium, citing *Serramonte*, 86 F.3d at 233, first contends the Board erred in finding any impasse in this case was broken because the Union merely professed its flexibility without making a new, concrete proposal. The Board, however, did not find the impasse had been broken because the Union changed its mind. Rather, the Board reasoned the Fund's "cancellation of the existing health insurance plan and the necessity of obtaining alternate coverage changed the backdrop of negotiations and created the possibility of productive bargaining."[*] 353 N.L.R.B. at 541.

---

[*] The Board also argues in its brief that any impasse was broken by the change in the ownership of the nursing home in December

We conclude the Board reasonably determined the cancellation of the health plan broke any impasse. Atrium's non-payment and the resulting cancellation "alter[ed] the economic calculus" of the Union, *McClatchy Newspapers*, 964 F.2d at 1173, by signaling a dramatically reduced likelihood the Union could convince the Employer to contribute significantly more to the Fund than it had offered, much less the 22.33 percent the Union had repeatedly demanded. Indeed, the cancellation led the Union to ask for information about the replacement health plan Atrium had implemented and eventually to tell the Employer it was willing to consider plans other than the one offered by the Fund. Because the principal issue in dispute between the parties was the rate at which the Employer would contribute to the Fund, the changed circumstance that led the Union to consider other health plans was sufficient "to suggest that future bargaining would be fruitful" and thereby to break any impasse. The Employer, therefore, is left with no defense to the Board's conclusions it violated the NLRA by refusing to meet and to bargain with the Union, by refusing to provide

---

2005. A majority of the Board, however, purposefully declined to adopt that rationale, the Board's only mention of which was to say "Member Becker would also [unlike the majority, that is] find that any impasse was broken by the imposition of a duty to bargain on a new employer ...." *Atrium at Princeton*, 356 N.L.R.B. No. 6, 2010 WL 4318370, at *1 n.3. This argument, as counsel for the Board surely knows, is foreclosed by the principle established in *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) (because "an order [of an agency] is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment").

relevant information to the Union, and by unilaterally implementing the replacement health plan.[*]

### III. Conclusion

We conclude substantial evidence supports the Board's findings that the Union was not responsible for the Fund's cancellation of the employees' health benefits and that the cancellation broke any impasse in bargaining. For that reason, and because the other defenses Atrium offers lack merit, we hold Atrium violated §§ 8(a)(1) and (5) of the NLRA by refusing to meet and to bargain with the Union, refusing to comply with the Union's information requests, and making various unilateral changes to the terms and conditions of employment. We therefore deny Atrium's petition for review and grant the Board's cross-application for enforcement of its order.

*So ordered.*

---

[*] We reject Atrium's last-ditch argument that even the Fund's cancellation of the health plan would not have led to productive bargaining, had the Employer sought renewed negotiations, because the cancellation was caused by the Union having acted in bad faith, *i.e.*, to pressure the Employer. As we have explained above, the Employer failed to establish its premise that the Union is responsible for the cancellation. The Employer's arguments that it did not violate the Act by cancelling an incentive pay program for certain nurses and by limiting the Union's right of access to nursing home facilities do not warrant treatment in a published opinion. Finally, insofar as Atrium seeks review of the Board's holding that its predecessor violated the Act by dealing directly with employees, the issue is not properly before the court because the predecessor did not petition for review.